Jamell A. Murphy #E71049
plaintiff,

United States District Court
For Southern Illinois East St. Louis Div.

V.

Wexford Health Care Source Corp.
(Deceased) Medical Dir. Wobasi
Medical Dir. Dr. Siddiqui
Menard C.C. Warden Lawrence
Defendants,

No. 19-1051-NJR

SCANNED AT MENARD and E-mailed
8-20-19 by SL 56 pages
date      Initials   No.

## Civil Complaint

### Jurisdiction & Venue

1) This Incident Occurred On or about Oct 5th 2011 in Randolph County Illinois.

2) The Jurisdiction of This Court is involked pursuant to The Civil Rights Act. 42 U.S.C § 1988 The Judicial Code 28 U.S.C § 1331 And § 1343 (a); of The Constitution of The United states, And pendant Under U.S.C § 1367 (a).

3) Venue is proper Under 28 U.S.C 1391 (b). On information And belief, all parties Reside in This Jurisdictional District, And The Events given Rise To The Claims Asserted Herein all Occurred within This District.

1

4) The plaintiff Jamell A. Murphy at all times in this complaint was in the full custody of the Illinois Dpt. of Corrections incarcerated at Menard Corr. Ctr. during the events described within this complaint.

5) The Defendant #1 Wexford Health Care Source Inc. which is a private corporation which has been at all times relevant under contract with the Illinois Dpt. of Corrections to provide Medical Care Service to Inmates including Jamell A. Murphy.

6) The Defendant #2 Warden Frank Lawrence is the Warden of Menard Correctional facility and is Responsible for the well being and safety of all Inmates under his Care at Menard Corr. Ctr.

7) The Defendant #3 Doctor Siddiqui (Wexford) is the Medical Director for Menard Correctional Center & is Responsible for all overall decisions Regarding Medical Care for all Inmates under his Care at Menard Corr. Ctr.

8) The Defendant #4 Medical Director Dr. Wobasi (Deceased) was employed by Wexford Health Care Source Inc. & was the Medical Director for Menard Correctional Center & was Responsible for all Inmates under his Care at Menard Corr. Ctr. in 2011. who since has Died.

who were acting under Color of State Law and in the Scope of their Employment with Wexford Health Care Source Inc. & Menard Corr. Center; Illinois Dpt. of Corrections and are Sued in their official & Individual Composity

2

9) Around Mid 2010 & up to 2011 while housed at Menard Corr-Ctr. facility the plaintiff Began to Suffer Medical problems with which he'd Cough up blood. The plaintiff put in for Sick Call ; was seen at the Health Care Unit ; later by at the time Medical Director Dr. Wobasi (Deceased ; Now Wexford Employed at the time). who ordered an x-Ray of plaintiffs chest ; Stomach area.

10) The plaintiff was seen the following week by the at the time Medical Director Dr. Wobasi to which he explained that He Believed He saw an Mass/lesion on My left lung by My (Aortic Arch Region) (see Exhibit D) 2011 Diagnostic imaging Report) to which Dr. Wobasi Referred plaintiff to Colligeal for CT scan which Wexford Administration approved further test.

11) On 10/5/2011 The plaintiff was taken to Memorial Hospital of Carbondale where He Received an examination: CT of The chest with and without IV Contrast. 50 mL Ultravist. which the findings was a Soft Tissue density Mass Hounsfield Units 43 Measuring approximately 2.5 x 3.0 by 3.5 CM with increased appearance of lymph Nodes Differential diagnosis includes but is Not limited to lymphoma versus less likely Metastatic disease further evaluation with PET CT is Recommend.

12) plaintiff Received a second test at St. Elizabeth's Hospital to which He Received a biopsy of his stomach on 1/6/12 to which I Tested positive for Organisms Call Hematemesis with No Signs of Ulcerations In 2011 After Both test During a follow up for The biopsy The plaintiff ask at the time Medical Director Dr. Wobasi The Results of The 10/5/2011 CT scan ; was Told That I was fine ; had an Ulcer That Caused blood To Cough up ; Was given Anti: Acid pills by Medical Director Wobasi Knowing That Something More Serious like Cancer possibly Existed I was told That The 10/5/2011 test Results were Reported Back To Wexford Health Care Source Inc. & They agreed That No follow ups were Needed as The Medical Issue was Deemed to Be not of a Serious Nature to plaintiff's Health. Over The Next eight year's The plaintiff's Medical Issues were Ongoing ; Became Worst In 2012 of March The plaintiff was shipped to Pontiac Corr. Ctr. where He Continued To Have Serious Medical Issues To where He'd Cough up Blood ; Due to Medical Director's Misdiagnosis while at Menard In 2011 Wexford And its Medical imployee's deliberately with indifference To Murphy's Serious Medical Needs failed to provide Adequate Care for The Mass on His lung ;

3

14) The plaintiff was examined by Doctors at three separate Correctional facilities within I.D.O.C & all Wexford Health Care Sourced & employed due to the ongoing illness becoming worst over the course of the 8 years in which it was first Discovered on 10/5/11 & Due to Wexford Health Care Source Inc. & former & Now Deceased Medical Director Dr. Wobasi's Refusal to follow up & provide Medical Care & further test on the Mass they knew to exist As Recommended in Oct of 2011 By Memorial Hospital of Carbondale (See Exhibit D)

5) In Sept 19 2018 after Being transfered Back to Menard Coll. Center it was then that the plaintiff Received a physical & it was Discovered that his Heart Beat was Irregular & his Condition Became Worst to which He Began Suffering Severe attack's of Coughing up blood Clots to which Menard's Current Medical Director Dr. Siddiqui Ordered an X-Ray of plaintiff's Chest.

16) To which During a follow up Dr. Siddiqui Also Informed the plaintiff that He Also Saw a Mass/lesion around the paratracheal to which he Called lesion 4.5 CM in size on 10/23/18 And on 12/21/18 the plaintiff Had a CT Scan of His Chest at St. Elizabeth Hospital to which Confirmed the Mass & An Additional On his spleen to which schedules for a biopsy Consultation. (See Exhibit E)

17) On 3-12-19 while waiting for outside screening plaintiff Suffered a Severe attack of Coughing up blood clot's & Had to Be Rushed Back to Carbondale Memorial Hospital Emergency Room Via State Care plaintiff was then Seen by Doctor's who did additional CT Scan's & Test. it was then that plaintiff learned The Truth about the 10/5/2011 CT Scan Results Once the doctor Explained that He Had Compared the 10/5/2011 Test Results from the CT Scan to those of which He Had just Ordered to Be Done (See Exhibit E of 10/5/2011 CT Scan Results & their Recommendations)

4

18) plaintiff was later seen By an outside specialist at Carbondale Hospital Doctor Russell Leon Mc.Elveen who would later proform plaintiffs Surgical procedure to Remove the mass which Had purposely been allowed to Grow within the plaintiffs lung for 8 years informed plaintiff that an additional mass Had taken Root on His spleen which was 2.0 cm in size as of now.

19) upon the Discovery that Wexford Medical Director Dr. Wobasi & Wexford Health Care Source Inc. Had purposely with Held Vital Medical information about the seriousness of His Medical Condition plaintiff filed Two grievances one addressing the plaintiffs 8 year Delay in Medical Care & inadequate Care & the at the time Medical Director's Dr. Wobasi & Wexford Health Care Source Inc.'s purpose with Holding of Medical Test Results in which were serious to plaintiffs health & Requesting Surgery to Remove the two mass from the plaintiffs lung & spleen grievance # 18-3-19 And grievance# ZZ0-3-19 to which was Denied & granted in part.

20) On 4-30-2019 8 years later along with 8 years of the mass growing & pain & suffering plaintiff Received Surgery to Remove the 5. cm Mass that was Discovered over 8 years ago & allowed to grow by Wexford Health Care Source Inc. & at the time Medical Director Dr. Wobasi from His left lung Portic arch Region But Due to the 8 year Delay in Treatment the mass attached itself to a nerve & During Removal plaintiff suffered permenant nerve Damage consisting of numbness on left side of chest extreme Hot needle like pain Center mass of chest Broken Rib's during procedure & screws & plates to which Remain for life. Due to the mass growing over 8 years Unchecked & the Full mass Could Not Be Removed Due to it Being attach to plaintiffs Nerve & to remove it would cause Further Damage.

21) During a follow up at Menard Correctional Center the plaintiff asked the Now Medical Director Dr. siddiqui to schedule him for additional surgical care to Remove the 2.0 cm mass which Had now formed on the plaintiffs spleen which was Denied by siddiqui & Wexford Health Care Source stomak; Testicle pain Resulting from it (see Exhibit B) despite having full knowledge of its existance & the Complaints of extreme

22) plaintiff THEN filed TWO GRIEVANCES DATED 3-14-2019 grievance# 220-3-19 and DATED 1-28-2019 grievance# 18-3-19 TO REDRESS Wexford Health Care Sources ; At THE TIME Medical Director Dr. Wobasis deliberately WITH Holding THE Results OF THE 10-5-11 CT SCAN WHICH delayed Medical TREATMENT for Over 8 years ; A GRIEVANCE addressing Dr. Siddiqui's ; Wexford's Refusal To Schedule additional Surgery To Remove THE NEW Mass ON plaintiffs spleen, WHICH Was Denied IN part ; GRANTED. plaintiff THEN Appealed THESE TWO denials To WARDEN Frank Lawrence ; THE To THE Administrative Review Board THUS fully EXHAUSTING All Remedies.

23) plaintiff has No plain OR adequate OR Complete Remedy AT LAW TO Redress THE wrongs described HEREIN plaintiff Has Been ; will Continue To Be IRREPARABLY life long Injuries By THE Conduct OF THE DEFENDANTS UNLESS THIS COURT GRANTS THE Relief which plaintiff Now Seeks.

## COUNT#1 42 U.S.C § 1983
### Deliberate Indifference To Serious
### Medical Needs of plaintiff

THE DEFENDANT Acting WARDEN FRANK LAWRENCE Violated plaintiff's 8TH Amendment Rights To THE United States Constitution WHERE He was deliberately Indifferent To THE Serious Medical Needs OF THE plaintiff WHERE HE Was put ON Notice OF plaintiffs Serious Medical Needs ; a 8 year Delay IN TREATMENT For A Mass On plaintiffs left lung WHICH Caused BreaThing problems ; Coughing up Blood Clots ; Had Now Caused An additional Mass To FORM On THE plaintiffs spleen via TWO GRIEVANCES appealed to Him Asking Dr. Siddiqui ; Wexford Health Care SOURCE To Remove BOTH Masses FROM THE plaintiffs lung ; spleen which Was Causing THE plaintiff EXTREME pain ; HEALTH ISSUES THE DEFENDANT after Reviewing All Medical DOCUMENTS And proof OF An 8 year Delay IN Medical TREATMENT Neglected His Duty's As WARDEN To ENSURE THE HEALTH ; SAFETY OF All INMATES WITHIN HIS Facility AND SHOW A deliberate Indifference To THE plaintiffs Health IN Direct Violation of THE U.S. Constitution 42 U.S.C. §1983. WARDEN Lawrence Was Also put ON Notice TWO OTHER TIMES WHEN THE plaintiff Spoke to Him WHILE He Was Making Rounds with THE Director OF I.D.O.C To WHICH I Was Told To File A GRIEVANCE about Medical TREATMENT & THE MASS On My Spleen Specifically!

6

## Count #2 U.S.C § 1983
## Deliberate Indifference To Serious Medical Needs
## Delayed Treatment

The Defendant Medical Director Dr. Siddiqui of (Wexford) violated plaintiffs 8th Amendment Rights to the United States Constitution where he was Deliberately Indifferent to plaintiffs Serious Medical Needs ; Also with Held Vital Medical Information about the Test Results from the Second CT Scan from 12-21-2018 which Conveyed the Discovery of an Additional Mass (location) on plaintiffs Spleen ; Come about as a Result of the Untreated Mass attached around plaintiffs left lung / Aortic Arch Region which was Discovered by at the time Medical Director at Menard Correctional Center Doctor Wobasi ; Wexford Health Care Source Inc. via CT Scan in 2011 Oct 5th ; did not Disclose the findings. 8 years later Medical Director Siddiqui ; Wexford Health Care Source Inc. ReDiscovered the preexisting Mass ; a new mass which had now formed and Refused to treat the new mass which's located on the plaintiffs Spleen & is 2.0 cm in size. even after they learn that the previous Mass had grown Over 8 years due to Non-treatment & even after Complaints of extreme stomach & Testicle pains ; Aches this delay in Medical Treatment for over 8 years Caused the plaintiff to suffer Unneededly from Oct 5th 2011 to May 30th 2019 ; presently showed a Deliberate Indifference to the plaintiffs Serious Medical Needs in Direct Violation of his Constitutional Rights 42 U.S.C 1983.

## Count #3 U.S.C § 1983
## Deliberate Indifference / Inadequate Medical Care / Delayed Care

Defendant Medical Director Doctor Wobasi (Deceased) Violated plaintiffs 8th Amendment Constitutional Rights when he purposely with held Vital Medical Information ; plaintiffs Medical Condition about a 3.5 cm Mass which had formed around plaintiffs Aortic Arche Region which Doctor's around the time believed to be Cancer (lymphoma) Wexford Health Care Source Inc. ; Medical Director Wobasi failed to provide Urgent Care ; Ignored the CT Scan Results from Carbondale Memorial Hospital & chose to with hold the Results ; Non-treatment for plaintiffs Serious Medical Needs And allowed the plaintiff to go 8 years in Delayed Treatment to which the Mass Spreaded ; grew from 3.5 cm to 4.5 cm attaching itself to a Nerve & Causing a Second Mass to from On the plaintiffs Spleen in Direct Violation of his Constitutional Rights 42 U.S.C 1983

7

THE Defendant's WEXFORD HEALTH CARE SOURCE Corp. a private Corp. thats under Contract with I.D.O.C (Illinois Dpt. of Corrections) provided the plaintiff with Inadequate Medical Care & purposely Denied the plaintiff Surgery & much needed Medical Care for over an 8 year spand when Wexford & it's Employees were made Aware of the Discovery of a 3.5 CM Mass which Existed around the plaintiffs left lung & Aortic arch Region & despite Being Informed By Memorial Hospital of Carbondale Both Wexford Health Care Corp. & it's Employee at the time Medical Director for Menard Corr. Ctr. Dr. Wobas & Concealed the plaintiffs Condition & Maintained the practice of a Informal policy which allowed the defendants Wexford Health Care Source Inc. & it's employees to provide Inadequate Medical Care to the plaintiff & Inmates within I.D.O.C. And to with hold the CT Scan Results of 10-5-2011 which found a Mass on the plaintiffs lung left Aortic Arch Region. This informal policy which As Inadequately trains Medical Staff & Inadequately provides or staffs the Medical staff & promotes Cutting Cost at the Health expense of Inmates like the plaintiff delayed Medical treatment for over 8 years & Caused 1) the original Mass to grow from 3.5 CM in size to 4.5 CM in size and attach it Self to a Nerve to which the plaintiff Suffered Nerve Damage Broken Ribs loss of feeling On left side Screws & plates In Rib's & This practice of Cutting Cost denied the plaintiff treatment & Care for over 8 years until the plaintiffs Condition Became Worsen'd & An additional Mass Took Root on this plaintiffs Spleen 2.0 CM in size & to which He Began to Cough up Blood & have Trouble Breathing after 8 years & pain & Suffering the plaintiff Received Surgery to Remove the Mass from His left lung But again Suffered Nerve damage Broken Rib's Screws & plates And the plaintiff was told that Wexford Health Care Source Inc. Denied further surgery to have The second Mass Removed from the Spleen despite Complaints of extreme Stomach pain & testicle pain No Scheduled Surgery has been Ordered nor follow up in Direct violation of His 8th Amendment Rights to the United States Constitution 42 § 1983 & showed a deliberate Indifference to the plaintiffs Serious Medical Needs.

The Defendants Medical Director Dr. Wobas (Deceased) & Wexford Health Care Inc. Intentionally Caused the plaintiff Emotional Distress when they purposely Ignored all Medical Recommendations from Memorial Hospital of Carbondale Regarding a 3.5 CM Mass on plaintiffs lung with was serious & Denied Surgery for over 8 years Causing The plaintiff further pain Suffering loss of sleep panic attacks & further Health Risk In Violation of 42 U.S.C § 1983 U.S.C Const.

# Relief Requested

WHEREFORE, plaintiff request that the Court Grants the following relief:

## A. Issue a Declaratory Judgment Stating That:

1. The eight year and with hold of the 2011 CT scan results by defendants Wexford Health Care Source Inc. & at the time Medical Director Dr. Wobasi violated the plaintiff's rights under the 8th Amendment to the United States Const. where they denied him adequate care & needed surgery for 8 years and exposed plaintiff to serious health risk further: to which an addition mass formed on plaintiff spleen.

2. Defendant Warden Frank Lawrence's failure to intervene once being made aware of the plaintiffs serious medical needs were deliberately indifferent & also violated his 8th Amendment rights to the United States Constitution.

3. Defendant Now Medical Director Dr. Siddiqui's failure to treat & inform the plaintiff about an additional 2.0 cm mass which had now formed on the spleen even after complaints of extreme pain violated his 8th Amendment rights & were deliberately indifferent & continues to expose plaintiff to health risk now.

4. Injunction ordering the defendants Warden Lawrence (Menard) Wexford Health Care Source & Medical Director Dr. Siddiqui to schedule surgery to have mass removed from the plaintiffs spleen which formed due to 8 year delay in treatment for original mass on the plaintiffs left lung, and all future care & yearly check up's CT scan to make sure mass stays the same size & nerve damage doesn't worsten by annorally check up's by outside specialist

## B. Plaintiff Demands Awards of Compensatory Damages in the Following Amounts:

1. $580,000 jointly & severally against Wexford Health Care Source Inc. & Medical Director Wobasi.

2. $85,000 against Wexford Health Care Source Inc. Dr. Siddiqui & Dr. Wobasi for allowing an ongoing informal policy to remain in place which allow the plaintiff to suffer 8 years untreated with a mass on his left lung & spleen due to inadequate medical care by Wexford & Employee's charged with plaintiffs care.

## C. Award of Punitive Damages in the Following Amounts:

1. $30,000 each Defendant Wexford Health Care Source, Warden Lawrence, Medical Director Dr. Siddique. & such relief as the courts deem plaintiff is entitled

## D. Triable By Jury on all issues:

Janell Murphy R21054
P.O. Box 1000
711 Kaskaskia Stat.
Menard Ill 62259

9

## VERIFICATION

I Jarnell A. Murphy # R71059, Being First duly Sworn, states & Verify as following: That i have Read The foregoing Complaint & Hereby Verify and state That The Matters alleged and Contained Therein are True Except as to Matters Alleged On information & belief, but are True To The best of his Knowledge And belief. And This Complaint was filed with The United states district Court southern illinois District Via E-file at Menard Corr. Ctr.

Pursuant To 28 U.S.C. 1746, I declare, Verify & state Under The penalty of perjury That The following is True & Correct.

Date 2-4-19

Jarnell Murphy # R71059
P.O. Box 1000
Menard, Ill 62259
Menard Corr. Ctr.

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**RESPONSE TO OFFENDER'S GRIEVANCE**

## Grievance Officer's Report

Date Received: December 13, 2018     Date of Review: January 2, 2019     Grievance # (optional): 169-12-18

Offender: Murphy, Jamell     ID#: R71059

Nature of Grievance: Medical Treatment

**Facts Reviewed:** All information submitted to the Grievance Officer by the offender or institutional staff pertaining to this issue(s) being grieved has been thoroughly reviewed. Offender submitted a grievance dated 12/9/2018 and grieves that he was refused medical treatment for complaints of coughing up blood around 10:38 p.m. on 12/8/18 while in North 2 segregation. Offender notified the gallery officer who then notified the sergeant and then the Lieutenant was notified. The Lieutenant asked offender if this was a regular thing. A mass was found during an x-ray and he scheduled to have an MRI to see what the mass is and what is causing his heart to pause and miss beat. Offender has had heart attack like pains for over 90 days. Menard Healthcare Unit refuses to send offender out for emergency treatment even when he has a serious medical issue. After offender was refused medical treatment, the cell house Lieutenant ordered offender to be placed back into his cell and he continued to suffer from shortness of breath, coughing up blood, and having severe chest pains. His cellmate tried to get him help, but his request was ignored.

**Relief requested:** "That I be treated and sent out to see if outside medical staff can treat my illness and to be compensated for my suffering."

The grievance was received as emergency grievance on 12/9/2018 and deemed of emergency nature by the Warden on 12/12/2018 and returned to Grievance Office for processing on 12/13/2018 as #169-12-18.

Grievance Office reviewed on 1/2/2019 – Contacted the Healthcare Unit and Angela Crain, RN Director of Nurses and Dr. Siddiqui, Facility Medical Director are in receipt of offender's grievance dated 12/9/18 regarding medical treatment. The offender self-reports that on 12/8/18, he was coughing up blood; shortness of breath and chest pain in the left lung and center mass of chest. The offender alleges that he did not receive treatment from the 3p-11p nurse. The offender medical record indicates that on 12/4/18, the offender was seen by Dr. Siddiqui to discuss x-ray results from 10/23/18. The offender was notified that he was referred to collegial for a CT scan of the chest due to a 5 cm lesion in the left paratracheal region. The offender was scheduled for a CT scan of the chest which was completed on 12/26/18. On 12/4/18, the offender was seen by nurse Tripp for concerns of nausea/vomiting and was sent to the HCU for chest and abdominal x-ray. The offender was seen by NP Zimmer on 12/7/18 and was ordered Tylenol and scheduled to follow up with NP/MD in one week. The offender was seen on 12/9/18 by nurse Chadderton for offender report of cough/blood tinged sputum. The offender was seen on 12/13/18 by Dr. Caldwell for follow up of the 12/9/18 visit Dr. Caldwell documented no cough at time of visit no changes to document. On 12/21/18, the CT scan of the chest was completed at St. Elizabeth's Hospital.

Continued on Page 2...

**Recommendation:** Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the inmate's grievance be MOOT. The offender is being seen and treated as medical professionals deem appropriate.

Larissa Wandro -   Menard Correctional Center
Print Grievance Officer's Name          *Larissa Wandro*
                                         Grievance Officer's Signature
(Attach a copy of Offender's Grievance, including counselor's response if applicable)

## Chief Administrative Officer's Response

Date Received: January 3, 2019     ☑ I concur     ☐ I do not concur     ☐ Remand

Comments:

_T. Lashbrook AW_          _2-7-19_
Chief Administrative Officer's Signature          Date

## Offender's Appeal To The Director

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

*Jamell Murphy*          K71059     2-5-19
Offender's Signature          ID#          Date

Page 2

The offender was scheduled to be seen on 12/24/18 for 5 day med furlough return; however, he was no longer housed in the scheduled cell house. The offender was seen by nurse Kirk on 12/24/18 for offender concern of nausea/vomiting the offender was scheduled to follow up with Dr. Siddiqui on 12/28/18. On 12/28/18, the offender was seen by Dr. Siddiqui to discuss the CT scan results from 12/21/18. Dr. Siddiqui referred the offender to collegial on 12/28/18 for possible biopsy of mass. The referral has not yet been approved for the biopsy at the time this grievance was answered. The offender has been approved for a cardiac evaluation on 12/6/18, which has been scheduled. No further nurse sick call noted in the offender medical since 12/24/18.

Illinois Department of Corrections
Jul 11, 2014 wbez.org
On July 28, 2012, Elawndoe Shannon put in a request for sick call at the prison where he was housed in Lawrence, Illinois. Two days later, he died. The day after his death a nurse in the health care unit finally got his request slip for medical care. "That means somebody took it and just said, 'Oh it don't matter, ain't nothing wrong with him.' That's crazy!" said his sister Jackie Shannon in a recent interview on the front porch of her house on Chicago's South Side. "Everybody's entitled to see a doctor. I don't care, you could live in a hole somewhere. If you come out of that hole and you're sick, you should be able to see a doctor. How many other ones in there that need to see the doctor are not seeing a doctor?" she said. It's not unusual for Illinois inmates to complain that they have trouble seeing doctors. In another story, WBEZ reported on Anthony Rencher who went to the prison health care unit in the middle of the night where he was observed in the waiting room for an hour before he returned to his cell where he died. And then there's the case of Daniel Nevarez. ..Letter from the grave: Daniel's brother Alonzo Nevarez sits on the front stoop of his dad's bungalow near Midway Airport and reads through a letter his brother Danny wrote from prison. "We got the letter after Danny passed, and it was, it's him talking from the grave actually," said Nevarez. It's in Spanish and Alonzo translates while he reads. "The reason for this card, to beg you to help him, he's sick, and the people from this facility, no me quieren, they don't want to help me. These people are not taking me serious. I need help." According to medical records, in March of 2010 Nevarez complained to a prison health care worker of pain in his knee. The prison took an X-ray but found nothing. The doctor prescribed some drugs and told Nevarez to exercise as much as possible. A year later Nevarez was still complaining about his knee. He was prescribed Motrin and referred to a doctor. The next two appointments with the prison doctor were cancelled, one because of understaffing and another one because there was no security escort. "He called when he was in prison complaining that they were ignoring him. They wouldn't let him see the doctor," said Nevarez. The medical records also show that on several occasions Nevarez refused to see health care workers. In one instance he's quoted as refusing to see the prison doctor because he wants to be immediately taken for surgery on his knee. On another occasion he refuses to pay the $2.00 co-pay and is therefore denied care. Cancer diagnosis: When the mass on his knee was diagnosed as cancer 15 months after his first complaints, the tumor was hard to miss. It was 5 centimeters by 5 centimeters by 3 centimeters. Daniel's father Salvador Nevarez said his son was complaining that the prison wasn't giving him health care, so the family had a lawyer contact the prison. Nevarez went to an outside hospital where the tumor was removed. He also went for 33 radiation treatments. A year after his treatments on December 13, 2012,Nevarez once again sought medical care. According to records he appears to have fainted and gotten a cut above his eye when he fell. He told doctors his head hurt and he couldn't remember things. A doctor at the facility seems to have decided Nevarez was lying in an attempt to get drugs. The way it's recorded in the medical record is: "appears to be med seeking." Nevarez was sent back to his cell. He fell into a coma. A CT scan of his head was taken and it showed he had two large, dense brain tumors and swelling in his brain. He died that day at the age of 31. The autopsy states, "Given the lack of follow up care and systemic chemotherapy for this patient, in combination with with the poor prognosis in general for such a tumor, it is not surprising that he developed widespread metastases a year after diagnosis." In the death review the department handed over to WBEZ, where it asks, 'Was an earlier intervention possible?' the answer is redacted. On the non-redacted version given to the family, it says the cancer diagnosis could have been made sooner, though it says it was, "probably too late for significant intervention." Seeing a doctor 'can take months': "It's a symptom of an overloaded system that it takes forever to get over to a doctor," said Alan Mills, an attorney specializing in prison litigation. "And then once you're there you don't see the doctor right away, you go through two or three screening processes before you finally get to see a doctor. So that can take months." "There are red flags all over the place," said Mills. "But without the details, you have to get beyond just saying, 'well this person died too soon.' You don't know that unless a doctor looks at the medical records and says, 'no this test was done or this test wasn't done, this is what the follow should have been and it wasn't.'" That work is now being done by a doctor appointed by a federal judge as part of the class action suit Mills filed over health care. The State of Illinois pays a company called Wexford Health Sources more than $100 million a year to provide health care in the prisons. Wexford did not return repeated calls for comment over the last two weeks. That's just the most recent refusal—WBEZ has had an ongoing request for an interview with the company for almost two years. Attorney Alan Mills has studied the contract between Wexford and the state. "Wexford gets paid the same amount whether they provide a lot of care or a little care, so therefore, every time they provide care their stockholders lose money. So that is a fine model, but you have to have some control to make sure that they're actually providing the care that you're contracted to giving them. Nobody in the state of Illinois regularly audits the Wexford contract, either financially, or more importantly, a health audit to see what the outcomes are that we're getting," said Mills. IDOC won't discuss Mills: Illinois Department of Corrections spokesman Tom Shaer won't discuss issues raised by Mills. "I'm not going to discuss anything that Alan Mills says because Alan Mills has been proven to state things that are false, so I'm going to respectfully decline to include any information coming from Alan Mills in this interview. Anybody else you want to talk about, fine, not him," said Shaer. The medical director who oversees more than $100 million Illinois pays Wexford for medical care refused to speak to WBEZ.

WBEZ asked Gov. Pat Quinn's office about the medical director's refusal to discuss medical care. After an initial conversation the governor's office simply ignored follow-up calls and emails from WBEZ. Illinois prisons have low death rates compared to other prisons: Shaer says focussing on just a few cases does not give an accurate picture of health care in the department. He points to Bureau of Justice statistics showing Illinois' prison system has one of the lowest death rates in the country compared to other prison systems. "We have pretty high standards here. We do the best we can within our ability to monitor that and if we felt that our ability wasn't adequate, we would find a way to address that," said Shaer. Independent experts should provide some answers soon: "I see enough things that tell me there are really some warning signs here. I mean there are problems," said State Rep. Greg Harris. Harris held committee hearings last year to dig into allegations of poor care. "You know in the testimony, in the contacts from individual families, in the lawsuits that have been settled and paid by the state for deaths that should have been preventable, I know there are things that we should have done that we did not do and that there are probably things that we ought to be doing better now," said Harris. As a result of the hearings, Harris concluded that no one in Illinois is paying close attention to the $100 million the state pays Wexford every year. Harris brought in the National Commission on Correctional Health Care to audit health care, both the finances, and the health outcomes. He says independent experts who know how to evaluate health care in a prison setting are looking at the system and should provide some answers soon. That audit is in addition to a federal court monitor who is also evaluating Illinois' prison health care system in response to complaints.

### Jan 20, 2014 couriernews.suntimes.com

A former Kane County Jail inmate is suing Kane County Sheriff Pat Perez, alleging that he was denied depression and anxiety medication during his incarceration, which led to a suicide attempt. Randy Brattin, 33, of Elburn, is seeking more than $50,000 in damages, and has named Perez, and Wexford Health Sources, Inc. in the suit he filed earlier this month. Wexford contracts with the jail to provide medical services to inmates, according to court records. Brattin was taken into custody on Nov. 30, 2012, on his fourth drunken driving charge, fleeing/eluding deputies and several other charges. During his incarceration, Brattin said he was denied his prescribed and required medication for the treatment of anxiety, depression and seizures. The suit claims that jail policy is to inventory medication brought in by an inmate, and then to have the Sheriff's Department's own medical staff supply the same or equivalent medications to the inmate. Brattin said in the lawsuit that never happened. Instead, he said, doctors never regularly examined him, or contacted his primary care physician or family regarding his medical care. In the suit, Brattin said he notified staff at the jail that he was supposed to be taking the medication. Brattin "never received the medication he requested" the suit alleges. Because of this, Brattin attempted to take his own life by cutting his wrists on Dec. 6, 2012, the lawsuit states. As a result of being denied his medication, Brattin "suffered severe depression, and/or panic attack ... and attempted to commit suicide," the suit states. Perez would not comment on the pending allegation. Brattin's case management conference is scheduled for Feb. 20 in Kane County.

### March 26, 2013 wbez.org

When William Jessup got to Vandalia prison he went to the dentist. Jessup says the dentist told him he had two cavities and offered to pull them. Wait..huh? "No, you're gonna pull my teeth out. Any qualified dentist will tell you it's always best to keep your teeth," said Jessup in a recent interview at the Vandalia prison in southern Illinois. "I'm assuming it still applies here but obviously it don't, because I still have the two cavities." When Anthony Rivera first got to Vandalia prison he caught some sort of foot fungus. His feet started smelling bad and he started getting sores, so he went to the doctor there and the doctor gave him foot cream but it was expired. When he told the doctor it was expired, he says the doctor told him that those were just numbers on the container, not an expiration date. "I'm like, what are you talking about," said Rivera. "It says 9/17/2010. How that's gonna be just regular numbers? He's like, well you don't want it then leave, so I took it just to take it. I put it on my feet but it got worse." Rivera says the sores on his feet got so large and painful that eventually he couldn't walk. "They gave me some kind of a shot and it relieved it a little bit but it took a nice three months," said Rivera. Illinois taxpayers are paying Wexford Health Sources, a private health care company, moe than $1.3 billion over ten years to provide care for inmates in prisons. But most of the inmates WBEZ has talked to say, unless it's an emergency, they're not getting the care taxpayers have already paid for. And the Illinois Department of Corrections doesn't seem to have any mechanism to ensure that taxpayers aren't being fleeced in the health care deal. One more case. Jeff Elders. (Elders and Jessup were both featured in our story Tuesday about Illinois spending big money on people convicted of relatively minor crimes. Jessup got a four-year sentence for having a stolen license plate sticker. Elders got a couple years for trying to steal $111 from J.C. Penney.) Elders has a hard growth on the palm of his right hand. He holds it up for me to see and pokes at the hard part. "It's all along the tendon," said Elders. It's climbing probably three inches up my hand on my tendon. That's all hard, real hard and right here there's a big ol' thing. It's pulling that finger in. They say it's a calcium build-up. They called it some kind of hemotobin globin, er..." It's like a hard stick under his skin that runs from his wrist towards the ring finger on his right hand. It breaks into two strands as it approaches the knuckle, making the growth under his skin look like the letter 'Y.' It pulls his one finger back so it's constantly curled and he can't straighten it out, and it's getting worse.

He went to see the prison doctor about the problem. "They tell you flat out, they can't do nothing for you," said Elders. "Unless it's an immediate issue, they're not doing nothing for you. He said, well, I'll give you some aspirins and I suggest you take care of it as soon as you can when you get out or you're going to end up like this, all crippled up, but there's nothing we're going to do for you here." Elders wasn't surprised by the 'treatment.' "That, to me, it's what I'm used to. It's the system. Everything's blamed on not enough money. What can you do with that? I have no kind of say so. If you back-talk anybody you're in trouble," said Elders. I took some of these stories to the guy in charge of Vandalia prison, Warden Victor Dozier. I told Dozier about Jessup, the guy who was told by the dentist that he had cavities and was also told that all they would do for him was pull the teeth. DOZIER: Really. WILDEBOER: Yeah. DOZIER: That's hard to believe but.... I also asked Dozier about Elders and the growth on his hand. Dozier said offenders can file grievances. That's the name for the formal complaint process in Illinois prisons. But in the next breath Dozier all but admitted that filing a grievance on a medical issue would be pointless. "If the doctor states, gives him a rational why he can't do it, I mean, he's our medical director. I can't question what he tells the offender," said Dozier. Admittedly, a corrections professional shouldn't be overruling the health care decisions of a medical professional. But then who does vet the health care decisions being made? In written statements given to WBEZ over the last several months, the Department of Corrections has said repeatedly that it oversees health care, holding, "monthly continuous quality improvement meetings." But the department has yet to provide someone who can explain exactly what happens at these meetings, who's involved or what information they're looking at. According to the prison watchdog group the John Howard Association no one seems to be providing meaningful oversight of prison health care. In fact, last year, the John Howard Association reported that the state entered into a more than $1.3 billion contract with a company called Wexford Health Sources without auditing the company's previous performance in the state. I asked Warden Dozier how he, as the top official at the Vandalia prison, ensures that Wexford is delivering the care that Illinois taxpayers have been paying for. "Okay, I don't have an answer for that," said Dozier. The lack of oversight has caught the attention of state Rep. Greg Harris. "Well, I've heard similar stories and actually worse, and I'm very concerned that we're paying about $1.3 billion dollars to a private company to manage health care in our prisons, and I want to look into are we getting quality health care for the folks for the money that we're paying," said Harris. Greg Harris has been looking into the health care contract. His interest was piqued by the John Howard Association report last year. Harris says his review of the contract shows that the deal is a good one as long as Wexford actually provides the care they're supposed to provide. "I mean we can't take the Department of Corrections word for it and we can't take the private company's word for it," said Harris. "I want somebody to go in and independently verify that people are being adequately treated." Harris is planning to hold a hearing on April 4th in Chicago to take a closer look at the contract. He's pushing to bring the National Commission on Correctional Health Care into Illinois prisons to provide independent oversight. Wexford declined to be interviewed for this story. In fact, the company with a billion-dollar public contract in Illinois has refused all of our requests for interviews. However, in a written statement, they said they provide medically necessary care as required by the constitution while at the same time acting as responsible stewards of taxpayer dollars. Wexford also says it welcomes Rep. Harris' push to bring a third party into the Illinois prisons to audit Wexford's performance.


Oct 11, 2012 The Associated Press
(Raleigh, NC) – Two guards at a private prison in North Carolina have been charged with accepting bribes to smuggle in cellphones and cigarettes. Rhonda Boyd and Raye Lynn Holley worked as correctional officers at Rivers Correctional Institution, a 1,450-bed prison in Winton, N.C. According to a federal criminal indictment made public Wednesday, Boyd is charged with conspiracy to commit bribery and acceptance of a bribe, while Holley is charged with accepting a bribe. The indictment alleges that the two had been smuggling contraband into the prison since early 2011. Rivers is a private prison owned by The GEO Group, Inc., a Florida-based company that contracts with the Federal Bureau of Prisons to house federal inmates and detainees. Many of the prisoners housed at the facility are from the District of Columbia.


October 9, 2012 WBEZ News
An Illinois state legislator is demanding answers about a huge healthcare contract for prison inmates. Democratic Rep. Greg Harris from Chicago's Northwest Side is pushing HR 1248, a House resolution calling for an official examination of how the state failed to audit Wexford Health Sources before signing a $1.4 billion contract with the private health care company last year. WBEZ has been reporting on poor health care in the prisons, and a recent report by the prison watchdog John Howard Association found that no one in the state is checking on Wexford to make sure they're providing the care they're being paid for. Harris's audit would change that. Harris says there are 250 lawsuits against the state right now alleging poor health care. He says he's been seeking proof that Wexford is actually earning the $115 million Illinois pays them every year, but he's not satisfied with what he's found. "I got a one-page response from the Department of Corrections saying they're doing it. To me that's just not adequate," said Harris. "We need to dig beyond what people tell us that there's no problem here, keep moving, there's nothing to see. We as legislators need to do our jobs and monitor these contracts." Harris says dollars are in short supply and there needs to be independent oversight of the enormous private contract. He says Wexford may be providing

great care to Illinois inmates, but he wants an independent agency to make sure that's the case.

**January 6, 2009** *The Pantagraph*
Unionized health care workers at 27 Illinois prisons are mulling whether to go on strike over wages. The 350-plus workers are employed by Wexford Health Sources of Pennsylvania, which recently received a two-year, $210 million extension in its contract to provide health care to inmates within the state's sprawling prison system. The health care workers represented by the American Federation of State, County and Municipal Employees union say they want a wage increase similar to a 4 percent boost the union recently inked with a different prison health care contractor. "Wexford should not have any difficulty meeting the pay and benefit levels of its competitors," AFSCME spokesman Buddy Maupin said Monday. The company, which has given embattled Gov. Rod Blagojevich $38,000 in campaign contributions since he took office, did not immediately respond to questions. The Illinois Department of Corrections said the matter, for now, is between the company and the union. "We hope they come to an agreement," said Corrections spokesman Derek Schnapp. It isn't the first time AFSCME has tangled with Wexford. Three years ago, union workers threatened to strike, raising the possibility that management-level health care workers would have to provide care to inmates. State officials averted the 2005 strike by firing Wexford and bringing in a new company. Wexford eventually was re-hired and received an extension to its contract in late December worth an additional $5 million over its previous deal.

**July 30, 2008** *AP*
Fighting back tears and apologizing to his teenage daughters, the former head of the Illinois prison system was sentenced to two years in federal prison Wednesday for taking payoffs from lobbyists. "What I did was absolutely wrong," said Donald Snyder, who admitted pocketing $50,000 from lobbyists when he was director of the Illinois Department of Corrections. He said he hoped his conviction on the charges would not bias employers against his daughters when they grow up and look for jobs. "I'm sorry, girls," he said, turning to the bench where they were sitting. As he tried to finish his statement, his face turned dark red, he grimaced and was unable to speak. Judge James B. Zagel chastised Snyder, who pleaded guilty, volunteered to be a federal witness, secretly recorded corrupt conversations and testified at the trial of one of the lobbyists. "I didn't believe much of your testimony and I didn't believe much of your testimony because of your claimed lack of memory," Zagel told him. He said Snyder diminished the stature of government officials by setting a terrible example and making people doubt their integrity. "You hear over and over against that all government officials are corrupt," said Zagel, a one-time Illinois law enforcement director. Zagel brushed aside letters from Snyder's neighbors in downstate Pittsfield, vouching for him as someone well liked in the community. "You should have stayed in Pittsfield," Zagel said. Snyder admitted that he took $30,000 from Larry Sims, a lobbyist for two vendors. He said he pocketed up to $20,000 from two other lobbyists, former Cook County undersheriff John Robinson and Michael J. Mahoney. Sims and Robinson have pleaded guilty. Mahoney was acquitted in a bench trial before Zagel who said he didn't believe Snyder's testimony. The case drew the spotlight not only because of Snyder's position but because Mahoney had lobbied the prison system while executive director of the John Howard Association, a prison reform organization. At his trial, Mahoney admitted what he had done but argued that whatever the ethical lapses, he simply had not done anything illegal. Zagel agreed, though he said the defense was "inherently unattractive."

**July 20, 2007** *Sun Times*
The former director of the Illinois Department of Corrections was indicted Thursday for allegedly taking $50,000 in illegal kickbacks to hand out state contracts to favored companies, including $20,000 in bribes from the former undersheriff of Cook County. The former undersheriff, John Robinson, who left his job under a cloud, had a side job as a lobbyist for companies such as Addus Health Care of Palatine, trying to get them state business. He succeeded in getting Addus a contract providing health-care services in Illinois prisons in part because he bribed then-state Corrections Director Donald Snyder with $20,000, according to the indictment. $30,000 in alleged bribes - "Addus Health Care has not had a relationship with Robinson for several years, is not accused of any wrongdoing, didn't know the alleged activity was taking place, and is assisting authorities every step of the way," said Dave Bayless, a company spokesman. Addusis referred to as "Company A" in the indictment. Also indicted Thursday was Larry Sims, a lobbyist who allegedly gave Snyder $30,000 in bribes so state business could go to an unnamed Pennsylvania health-care company. Snyder, 52, of Downstate Pittsfield, was director of the state prisons under former Gov. George Ryan, from 1999 until 2003. Thursday's indictments grew out of the Operation Safe Road probe of corruption in the Ryan administration. Robinson, 59, of Barrington Hills, was undersheriff of Cook County from 1991 until 2000. He resigned amid a grand jury probe of him allegedly using his undersheriff stationery to solicit business for a British Virgin Islands-based company that ran an alleged investment scam. He was never charged. Robinson was undersheriff for part of the time he allegedly passed money — in increments, totaling $20,000 — to Snyder. 5 counts of mail fraud - "John is in a proper manner facing his charges. He will do what is right," Robinson's lawyer, George Collins, said. Robinson is currently unemployed, Collins said. Sims, 58, of Downstate Pleasant Plains, was a lobbyist for several vendors, including the Pennsylvania company. Snyder and

Robinson were each charged with five counts of mail fraud. Sims was charged with one count of perjury for allegedly lying to the grand jury during the investigation. Attorneys for Snyder and Sims could not be reached for comment. [Indictment is at www.usdoj.gov/usao/iln/pr/chicago/2007/pr0719_02.pdf ] [US Attorney Press Release]

## October 26, 2006 *Sun Times*

Gov. Blagojevich remembers political insider Stuart Levine spilling a cup of coffee on him during a New York fund-raising trip that is under federal scrutiny, but insists Levine spilled nothing about any illegal scheme to trade government business for campaign cash. "That's ridiculous," Blagojevich said Wednesday. "Absolutely not. Of course not." The Democratic governor spoke for the first time in detail about the 2003 trip as supporters of his GOP rival, state Treasurer Judy Baar Topinka, said an itinerary shows Blagojevich illegally mixed government and political fund-raising. The itinerary lists meetings at New York's Harvard Club between Deputy Gov. Bradley Tusk, top Blagojevich fund-raiser Christopher G. Kelly and representatives of two companies. Those firms, Maximus Inc. and Wexford Health Sources, do millions of dollars in state business each year. Each also has contributed five-figure sums to Blagojevich. Feds probing trips: The Chicago Sun-Times last month reported that the Oct. 29, 2003, trip – plus another to the East Coast later -- are focuses of a federal pay-to-play probe of state government. "The chief fund-raiser is meeting with people who are interested in government contracts along with a high-ranking member of the governor's staff," said Joe Birkett, DuPage County's state's attorney and GOP candidate for lieutenant governor. "You're setting the table to exchange your governmental decision-making in exchange for a political benefit." Blagojevich campaign spokesman Doug Scofield dismissed the criticism. Kelly and Tusk, he said, never met with Wexford or Maximus – despite what the "preliminary draft" schedule indicates. "Bradley and Chris were not in any meetings together. I really have no idea why it would be that way on the schedule," Scofield said. "You have a schedule that looks like it's inaccurate in a number of ways."

## August 25, 2006 *The New Mexican*

Santa Fe County has interviewed four people who applied to be the new jail administrator. One high-profile candidate, however, took her name out of the hat just before interviews were slated to begin Thursday. Ann Casey, a lobbyist and Illinois jail official embroiled in controversy over her relationship with state Corrections Secretary Joe Williams, had applied for the job along with five others. Casey canceled her interview Thursday and said she no longer wanted to be considered for the job, according to Assistant County Attorney Carolyn Glick. Casey was in the news in New Mexico when the state put Williams on unpaid leave and launched an investigation. Officials looked into his relationship with the woman, including use of his work cell phone and other expenses after the Albuquerque Journal reported billing records for his state cell phone showed 644 calls between the two over five months. Williams returned to work and is on probation following what a governor's aide called "a lapse in judgment." Illinois officials also looked into the matter, but Casey remains in her position of assistant warden at the Centralia Correctional Center, said department spokesman Derek Schnapp. Casey was not available for comment.

## May 31, 2006 *New Mexican*

A state prison contractor involved in the investigation of a relationship between Corrections Secretary Joe Williams and a lobbyist contributed $10,000 to Gov. Bill Richardson's re-election campaign. The political-action committee for Aramark – a Philadelphia-based company that makes millions of dollars a year to feed New Mexico inmates – contributed to Richardson's campaign in May 2005, according to Richardson's most recent campaign-finance report. That was about a year after Aramark renewed its contract with the state Corrections Department. Aramark also has been generous to the state Democratic Party, contributing $10,000 in 2004, and the Democratic Governors Association, which Richardson chairs. The company contributed a total of $15,000 to the DGA in 2004 and another $15,000 in 2005, according to reports filed with the Internal Revenue Service. Aramark provides food service to more than 475 correctional institutions in North America. The corporation also has food-service contracts in colleges, hospitals, convention centers and stadiums. Richardson spokesman Pahl Shipley referred questions about the campaign donation to Richardson's campaign manager, Amanda Cooper, who couldn't be reached for comment. The Governor's Office announced this week that Williams is being put on administrative leave while the state Personnel Office investigates his relationship with Ann E. Casey, who registered as a lobbyist for Aramark and Wexford Health Services, which provides health care to New Mexico inmates. Casey is an assistant warden at an Illinois prison. A copyrighted story in the Albuquerque Journal said Williams' state-issued cell-phone records show 644 calls between Williams and Casey between Sept. 24, 2005, and Feb. 23. According to that report, Casey was hired as a consultant by Aramark in 2005, but that contract has since been terminated. Aramark's $5.4 million contract ends in July. The Secretary of State Office's Lobbyist Index lists Casey as a lobbyist for Wexford, though the Journal report quotes a Wexford official saying the company never hired her. In 2004, a $10,000 contribution to a Richardson political committee from Wexford's parent company caused a stir and later was returned to the Pittsburgh company. The Bantry Group made the contribution to Richardson's Moving America Forward PAC in April 2004. This was during a bidding process just a

month after the Corrections Department requested proposals for a contract to provide health care and psychiatric services to inmates. That contract potentially is worth more than $100 million, The Associated Press reported. In August 2004, a Richardson spokesman said the money would be returned "to avoid even the appearance of impropriety."

**May 30, 2006 *AP***
Gov. Bill Richardson has put Corrections Secretary Joe Williams on unpaid leave while the secretary's recent actions are investigated. Richardson said the review will focus on Williams' use of a state-issued cell phone, a state-funded trip that included some personal travel and his relationship with a lobbyist. "Gov. Richardson wants a thorough investigation to examine the secretary's actions and determine if anything improper occurred," said James Jimenez, Richardson's chief of staff. "The governor sets a very high ethical standard for his administration and will not tolerate any level of abuse of authority or public trust." A spokeswoman for the Corrections Department said Williams was unavailable for comment. State Personnel Director Sandra Perez will conduct the investigation through her office, Jimenez said. Williams will be on unpaid leave until June 9, the day Perez's office is to report to the governor. The Albuquerque Journal reported Sunday that Williams spent about 91 hours on his state-issued cell phone talking with Ann Casey, an assistant warden at a state prison in Centralia, Ill. The calls between the two phones were placed between Sept. 24, 2005, and Feb. 23, 2006. Casey registered as a lobbyist in 2005 for two companies that have contracts with New Mexico to provide health care and meals to prisoners. Williams described his relationship with Casey as a friendship and said he doesn't give preferential treatment to anybody. Richardson also is questioning a trip Williams took to Nashville on the state's dollar. In January, Williams attended a conference of the American Correctional Association. His travel records show he added a St. Louis leg to the trip, which he said was personal. A 30-mile drive from the St. Louis airport would land Williams at an address in O'Falcon, Ill., which Casey listed on lobbyist registration forms. Records show Williams wrote a check to his department in January for $266, the cost of adding the St. Louis trip. While on the trip, Williams and Casey accepted a dinner invitation from a company that operates a state prison in Santa Rosa, according to Williams' e-mail records. A billing statement for a hotel stay during the trip also lists two people in his party, but Williams would not say who the second person was. Richardson appointed Williams, a former warden at the Lea County Correctional Facility in Hobbs and former warden at two state prisons, as corrections secretary in 2003.

**November 24, 2005 *State Journal Register***
Less than five months after the state government canceled a contract with Wexford Health Sources to provide health care for most prison inmates, the company is resuming those duties with a new contract worth a potential $547 million. The Illinois Department of Healthcare and Family Services, which handles health-care procurement for most state agencies, awarded the contract late Wednesday. The agreement will pay Pittsburgh-based Wexford $97.6 million in the first year and $103.9 million in the second year, said HFS spokeswoman Kathleen Strand. Among the other bidders on the contract was Peoria-based Health Professionals Ltd., which the state hired after ending its previous contract with Wexford in July. HPL had prior agreements with the state to provide inmate health care at 10 other Illinois prisons, and those remain in effect, Strand said. The state canceled the earlier contract with Wexford just before the company's union-represented workers planned to go on strike. Workers said they authorized the strike because they were making little progress in contract talks with Wexford. The Department of Corrections awarded emergency contracts worth an estimated $55 million to HPL, and agency officials said at the time that the contracts soon would be put out for long-term bid. The emergency contracts cover the period from July 5, 2005, to Jan. 31, 2006. Wexford has contributed about $25,000 to Illinois political campaign funds since 1994, according to the State Board of Elections' Web site. The largest contribution was $10,000 to Friends of Blagojevich, the governor's fund, in November 2003.

**August 27, 2005 Southern Illinoisan**
In July, healthcare workers in Illinois prisons were so unhappy with Wexford Health Sources Inc., the company that employed them under contract with the state, they threatened to go on strike. Gov. Rod Blagojevich stepped in and pulled the contract from Wexford and awarded it to Health Professionals Limited. But the workers are still unhappy with Wexford, alleging the company has failed to pay them for accumulated "paid time off" including vacation and sick days. Wexford officials said it may be as late as October, but they will indeed pay what is owed pending receipt of information from HPL and money owed by the state of Illinois.

**August 11, 2005 Pantagraph**
In her job as a pharmacy technician at Lincoln Correctional Center, Kirsten Lolling has doled out pills and prescriptions to prison inmates for more than 12 years. On Wednesday, Lolling received some good medicine herself in the form of a 24 percent pay hike and a host of other improvements in her wage and benefits package. The added cash comes as part of a union contract ratified Wednesday by nearly 380 privately employed prison health care workers. Overall raises differ at the 23 prisons affected by the deal. The American Federation of State,

County and Municipal Employees union reports its contract with Peoria-based Health Professionals Ltd. will result in better retirement benefits, cheaper health care costs and added benefits for education and length of service. Faced with the prospect of having inadequate staffing levels in many of its prisons, the Illinois Department of Corrections dropped Wexford and its $83 million contract and brought in HPL, which was already providing health care services at nine other state prisons.

July 7, 2005 *Pantagraph*
A Pennsylvania-based company may sue the Illinois Department of Corrections after the agency abruptly canceled its contract to avert a labor strike. "We are looking at all our options," said Elaine Gedman, human resources chief of Pittsburgh-based Wexford Health Sources Inc. "This is totally unprecedented." The potential lawsuit comes in response to action the state took Sunday as the clock ticked down on a potential strike by nearly 380 nurses, pharmacists and other health-care professionals who work in the prison system but are employed through Wexford. The workers, represented by the American Federation of State, County and Municipal Employees Council 31, had threatened to walk off the job Tuesday if their contract demands were not met. Dozens of workers at prisons in Dwight, Pontiac and Lincoln are covered by the labor contract. But a strike was averted late Sunday when the state terminated its lengthy relationship with Wexford — worth about $83 million this year -- and hired a second company to manage health care at the prisons. The affected workers, meanwhile, remain on the job while AFSCME attempts to negotiate a new labor agreement with the new contractor, Health Professionals Limited.

July 5, 2005 *State Journal Register*
The state has dropped its contract with Wexford Health Sources Inc. to provide health services at 23 state prisons on the eve of a scheduled strike by its employees. Department of Corrections spokeswoman Dede Short confirmed that an agreement had been reached between Corrections and Health Professionals Limited to take over the Wexford contracts, which were cancelled Monday. Health Professionals Limited is a private vendor that currently provides similar health services in nine prisons, according to representatives of American Federation of State, County and Municipal Employees Council 31, which represented the Wexford prison employees. As a result, the strike that had been scheduled to begin at 7 a.m. today, affecting more than 350 Wexford employees at 23 state prisons, has been put on hold, according to Anders Lindall, public affairs director for AFSCME Council 31. Negotiations broke off Friday between Wexford and the union. At the heart of the dispute is the difference in pay, health and other benefits between Wexford's employees and state workers, some of whom reportedly make twice as much as private vendor health employees doing similar jobs. Wexford's workers provided medical, dental and mental health services at nearly two dozen state prisons.

June 26, 2005 *Lincoln Courier*
More than 350 health care workers at Illinois prisons, including those at Lincoln and Logan correctional centers, will go on strike July 5 if contract negotiations between their union and their employer, Wexford Health Sources, fail to produce an agreement.    Wexford has state contracts to provide health care at nearly two dozen correctional facilities.    The union-represented Wexford workers voted 356-5 this week to authorize a strike, said Buddy Maupin, regional director for Council 31 of the American Federation of State, County and Municipal Employees. For instance, he said, Wexford employees at state prisons are paid "vastly inferior" wages compared with state employees doing the same work.    Kirsten Lolling, a pharmacy technician at Lincoln Correctional Center, said she is paid $14 an hour, despite having 13 years of experience. State employees doing the same job are paid about twice as much, she said.    "Philosophically, we don't think that the state should exploit its Wexford work force by using a low-wage, low-benefit vendor to save money on the labor costs," Maupin said.

June 24, 2005 *Copley News Service*
Frustrated by a lack of progress in contract talks, more than 350 workers who provide health care services to Illinois prison inmates have been taking strike-authorization votes, the results of which will be announced today.  A contract between AFSCME and Pittsburgh, Pa.-based Wexford Health Sources Inc. expires at midnight June 30, AFSCME spokesman Anders Lindall said Thursday. Wexford has state contracts to provide health-care services at most Illinois prisons. Negotiations on a new agreement started in April, but they have not gone smoothly, Lindall said.  Wexford has proposed an "array of draconian takeback measures," including reductions in pay and benefits, he said.

August 18, 2003 *Sun Times News*
The union representing Illinois' 15,000 state prison employees is praising Governor Blagojevich's approval of legislation that would bar the privatization of prison commissary services. Illinois law already prohibits the privatization of all security functions in the state prisons. AFSCME Council 31 initiated the new measure after former Governor George Ryan made an aggressive effort to contract out commissary services in the state's 37 correctional facilities. Ryan contended that no security function was involved in the commissaries, which sell non-

essential goods to inmates at reduced prices. SB 629 makes explicit the prohibition against privatization of commissary services. It passed the General Assembly earlier this year by overwhelming majorities in both houses.

April 28, 2003 *Clinton Herald*
There's no money in the Illinois budget to staff and operate the Thompson prison next year but the state is exploring options for using that facility and other prisons not currently open. One option would be to turn those facilities into federal prisons. Doing so would require the Illinois Department of Corrections to first turn over the prisons to private companies to run, and the private companies would then lease the space to the federal prison system.

April 10, 2003 *The Southern Illinois*
Union picket lines could begin appearing as early as next week at eight Illinois Department of Corrections facilities because of stalled contract talks between health care workers and the private vendor that employs them. Health care workers have been without a contract since Dec. 31 and have set Monday as a strike date, said Mark Samuels, public affairs director for the American Federation of State, County and Municipal Employees, the state's largest public-service employee union. AFSCME Regional Director Buddy Maupin said Tuesday that HPL is one of three primary suppliers of health care services to the state corrections system. Wexford and Addus are the other two principal contractors. Maupin said HPL's contract proposals are not only "inferior" to wages and benefits earned by state employees in IDOC who provide the same services, but they are also below those paid by Wexford and Addus.

# State of Illinois - Department of Corrections
## Counseling Summary

| | | | |
|---|---|---|---|
| **IDOC #** | R71059 | **Counseling Date** | 03/15/19 12:47:06:993 |
| **Offender Name** | MURPHY, JAMELL | **Type** | Collateral |
| **Current Admit Date** | 05/27/2008 | **Method** | Other |
| **MSR Date** | 01/12/2059 | **Location** | MEN GRIEVANCE OFFICE |
| **HSE/GAL/CELL** | N2-06-26 | **Staff** | RAMSEY, SHEILA M., Office Coordinator |

Grievance Office received grievance #220-3-19 regarding surgery to remove lesions/mass from lung/spleen dated 3/14/2019. Forwarded to Clinical Services for Counselor's response.

**Print Date** 3/15/2019

Exhibit C
8-34

# State of Illinois - Department of Corrections
## Counseling Summary

| | | | |
|---|---|---|---|
| IDOC # | R71059 | Counseling Date | 04/02/19 13:02:53:820 |
| Offender Name | MURPHY, JAMELL | Type | Collateral |
| Current Admit Date | 05/27/2008 | Method | Grievance |
| MSR Date | 01/12/2059 | Location | MEN GRIEVANCE OFFICE |
| HSE/GAL/CELL | N2-06-26 | Staff | RAMSEY, SHEILA M., Office Coordinator |

Grievance Office received grievance #29-4-19 regarding MEN failed to disclose medical info to offender/wants surgery to remove mass from spleen dated 3/31/2019. Forwarded to Clinical Services for Counselor's response.

Print Date 4/2/2019

*Exhibit D*

# MEMORIAL HOSPITAL OF CARBONDALE

405 WEST JACKSON
CARBONDALE IL 62901
618-549-0721

## DIAGNOSTIC IMAGING REPORT

**PATIENT:** *e7159*
MURPHY, JAMELL

**ACCT:**
M86012946229

**MR#:**
MH00378885

**DOB:**
06/08/1980

**PT LOC:**
MOIMG

**ORDER#:**
CT20111005-0028

**ORD MD:**
SHEPHERD, JOHN R MD

**COPY TO:**
SHEJOH3

**EXAM DATE/TIME:**
10/05/11 1130

**REASON FOR ADMISSION:** SOFT TISSUE PROMINENCE L AORTIC ARCH REGION
**SIGNS AND SYMPTOMS:** SOFT TISSUE PROMINENCE L AORTIC ARCH REGION

**EXAM DESCRIPTION:** CT CHEST COMPLETE

**Examination:** CT of the chest with and without IV contrast. 50 mL of Ultravist.

**History:** Soft tissue prominence in the left aortic area regions.

**Comparison:** None.

**Findings:** There is a soft tissue density mass Hounsfield units 43 measuring approximately 2.5 x 3.0 by 3.6 cm seen in the left anterior mediastinum and adjacent to the aortopulmonary window with increased appearance of lymph nodes adjacent. No
evidence of supraclavicular, axillary or hilar lymphadenopathy. Minimal enhancement following administration of contrast.

There is a pulmonary nodules seen on image 26 measuring approximately 30 x 4 mm. Within the right lung.
No other noncalcified pulmonary nodules or masses. No pulmonary nodules or masses seen in the left lung.

Visualized portions of the thyroid, heart, liver, gallbladder, spleen, esophagus, stomach, pancreas, pancreatic duct, common bile duct, adrenals, and kidneys are unremarkable. No lytic or blastic bony lesions. No evidence of lymphadenopathy
throughout the abdomen or pelvis.

**Impression:** Soft tissue density mass seen in the left mediastinum and aortopulmonary window with some cyst rounding small thought to represent lymph nodes that are not enlarged by CT criteria, and a pulmonary nodule noted in the right upper lobe.
Differential diagnosis includes but is not limited to lymphoma versus less likely metastatic disease further evaluation with PET CT is recommended.

**MEMORIAL HOSPITAL OF CARBONDALE**

MURPHY,JAMELL
ORDER# CT20111005-0026
M88012946229

---

Electronically signed by: JAMES ALEXANDER M.D.
Date:    10/05/2011
Time:    15:34
    10/05/11 1539

TR: CF                      DD: 10/05/11 1534          DOC ID: 1005-0462
DP: ALEJAM1                 DT: 10/05/11 1534          JOB ID:





12:01:04 p.m. 12-26-2016        2        HSHS

ST ELIZABETH'S HOSPITAL OFALLON
ONE ST ELIZABETH'S BLVD
O FALLON IL 62269

Murphy, Jamell
MRN: 570808877, DOB: 6/8/1980, Sex: M

*Exhibit E*

*RJ1059*

**Imaging**

**CT**

**CT CHEST W CON (Completed)**

Order status: Completed
Filed by: User, Interface683307 12/21/18 1534
Accession number: SEO2974702

**Narrative:**

EXAMINATION: CT Chest with contrast

Resulting lab: HSHS-ST ELIZABETH'S OFALLON (SEO)
RAD
Performed: 12/21/18 1055 - 12/21/18 1100
Resulted by: Gregory P Holdener, MD
Resulted: 12/21/18 1533, Result status: Final result

**CT CHEST W CON**

EXAMINATION: CT Chest with contrast

ACCESSION: SEO2974702

EXAM DATE/TIME: 12/21/2018 10:55 AM

REASON FOR EXAM: 58307835
Parahechial mass, Short of breath, Chest pressure.

COMPARISON: None

TECHNIQUE: Axial CT images of the chest are obtained following intravenous
administration of 100 mL Isovue-370. Subsequent coronal and sagittal
reformatted sequences are created for evaluation. Automated exposure
control was utilized for dose reduction.

FINDINGS: Heterogeneously enhancing mass superior to the aortic arch along
the left margin of the upper mediastinum. This mass measures 4.5 x 2.9 x
1.7 cm. Other adjacent smaller masses, likely lymphadenopathy noted.
Etiology of this mass lesion is uncertain. Neoplasm is a possibility. No
other parenchymal mass or adenopathy. Calcified granuloma right upper lobe.
No other parenchymal nodule. No pleural effusion or pneumothorax.
Low-density nodule of the spleen measuring up to 2.0 cm. Etiology
uncertain.

Impression:
==== IMPRESSION: ====
1.   Upper left mediastinal mass measuring 4.5 x 2.9 x 1.7 cm. Other
     adjacent smaller nodules, likely adenopathy. Malignant neoplasm is
     possible. Biopsy should be considered.
2.   2.0 cm splenic nodule. Possible metastasis.
3.   Calcific granuloma right upper lobe.

Electronically Signed By: Gregory P Holdener MD on 12/21/2018 3:33 PM

**Testing Performed By:**

| Lab - Abbreviation: | Name | Director: | Address | | | Valid Date Range |
|---|---|---|---|---|---|---|
| 188 - RADSEO | RAD OFALLON (SEO) ELIZABETH'S HSHS-ST | Unknown | Unknown | Unknown | | 08/28/17 1523 - Present |

**Indications**

Chest mass [R22.2 (ICD-10-CM)]

**Study Result**

EXAMINATION: CT Chest with contrast

Recorded in Adobe as APP 25 of 47

ST ELIZABETH'S HOSPITAL O'FALLON
ONE ST ELIZABETH'S BLVD
O FALLON IL 62269

R71059
Murphy, Jamell
MRN: 57060877, DOB: 6/8/1980, Sex: M

**Imaging (continued)**



ACCESSION: SEO2974702

EXAM DATE/TIME: 12/21/2018 10:55 AM

REASON FOR EXAM: 58307835
 Paratracheal mass. Short of breath. Chest pressure.

COMPARISON: None

TECHNIQUE: Axial CT images of the chest are obtained following intravenous
administration of 100 mL Isovue-370. Subsequent coronal and sagittal
reformatted sequences are created for evaluation. Automated exposure
control was utilized for dose reduction.

FINDINGS: Heterogeneously enhancing mass superior to the aortic arch along
the left margin of the upper mediastinum. This mass measures 4.5 x 2.9 x
1.7 cm. Other adjacent smaller masses, likely lymphadenopathy noted.
Etiology of this mass lesion is uncertain. Neoplasm is a possibility. No
other mediastinal mass or adenopathy. Calcified granuloma right upper lobe.
No other parenchymal nodule. No pleural effusion or pneumothorax.
Low-density nodule of the spleen measuring up to 2.0 cm. Etiology
uncertain.



 IMPRESSION: =====
1.   Upper left mediastinal mass measuring 4.5 x 2.9 x 1.7 cm. Other
adjacent smaller nodules, likely adenopathy. Malignant neoplasm is
possible. Biopsy should be considered.
2.  2.0 cm splenic nodule. Possible metastasis.
3.  Calcific granuloma right upper lobe.

Electronically Signed By: Gregory P Holdener MD on 12/21/2018 3:33 PM

**Signed**

Electronically signed by Gregory P Holdener, MD on 12/21/18 at 1534 CST

*Exhibit F*

## TOUCHETTE/KENNETH HALL REGIONAL HOSPITAL
### 5900 BOND AVENUE
### CENTREVILLE, IL 62207

### REPORT OF OPERATION

| PATIENT NAME:<br>MURPHY, JAMELL R71059 | DOB:<br>06/08/80 | HOSPITAL #:<br>V00060251518 | MR #:<br>M000275301 | LOC:<br>T.OPS | DATE:<br>01/06/12 |
|---|---|---|---|---|---|
| ATTENDING:<br>LEYLAND A THOMAS, MD | | SURGEON:<br>LEYLAND A THOMAS, MD | | | |

JOB # 136701

PREOPERATIVE DIAGNOSIS:  Suspected hematemesis.

POSTOPERATIVE DIAGNOSIS:  See below.

PROCEDURE:  Upper endoscopy.

INSTRUMENT USED:  Pentax EG 3470 K upper endoscope.

MEDICATIONS:  Demerol 50 mg IV push plus Versed 4 mg IV push in incremental doses.

INDICATIONS FOR PROCEDURE:  The patient is a 31-year-old old man with suspected hematemesis.

DESCRIPTION OF PROCEDURE:  The patient was placed in the left lateral decubitus position and the above medications were given.  When he appeared to be adequately sedated the instrument was placed into the oral cavity and advanced beyond the upper esophageal sphincter into the stomach, then through the pylorus and into the second portion of the duodedum.  The duodenal mucosa was unremarkable.  The pylorus was symmetrical.  The instrument was then pulled back into the gastric lumen.   Scattered healing erosions were identified.  There were punctate areas of erythema scattered throughout the gastric mucosa.  Biopsies were taken from the antrum for Clotest and randomly from the gastric mucosa for routine histology.  On retroflexion, the GE junction appeared grossly normal. the instrument was then pulled back into the esophagus.  The Z-line was distinct. There was linear erythema of the distal esophagus. No ulcerations were identified.  He tolerated the procedure well.  No complications were encountered during the procedure.

IMPRESSION:    1.  Erosive gastritis.
               2.  Distal esophagitis.

M.D. REVIEW   1/19/12
DATE
DOCTOR
PULL CHART
SEE PATH MD                    CC/PE/HIV
FILE

| Patient Name:<br>MURPHY, JAMELL R71059 | Hospital #:<br>V00060251518 | MR#:<br>M000275301 | Date:<br>01/06/12 |
|---|---|---|---|

Operative Report    NAME:   MURPHY,JAMELL R71059                    ACUT #: V00060251518

RECOMMENDATIONS:   1.   Check results of Clotest and biopsy and treat if helicobacter is
                        present.
                   2.   Consider discontinuing aspirin.
                   3.   Omeprazole 40 mg a day fo 8-12 weeks.


SHEPHERD,JOHN R MD

 CC:
        LEYLAND A THOMAS, MD

DDT: 01/09/12 1053
TDT: 01/10/12 1030
THOLE      /JC



M.D. REVIEW  1/19/12
DATE
DOCTOR
PULL CHART
SEE PATIENT                    GI/PE/HIV
FILE

---

**Patient Name:**          **Hospital #:**        **MR#:**           **Date:**
MURPHY,JAMELL R71059        V00060251518          M000275301         01/06/12

---

Touchette/Kenneth Hall Hosp PCI LIVE (PCI: OE Database BSL)          DRAFT COPY

Run: 01/19/12-12:56 by DOWNEY,NINA                                  Page 2 of 2

*Exhibit*
*G*

Touchette Regional Hospital
5900 Bond Avenue
Centreville, IL 62207
External Specimen Inquiry

SPEC #: S12-12        RECD: 01/07/12-1919    STATUS:  SOUT      REQ #: 01141972
                     COLL: 01/06/12-1244    RHRM DR: THOMAS,LEYLAND A MD

ENTERED:    01/07/12-1921     SP TYPE: GASTRIC BX    OTHR DR:
ORDERED:    GROSS & MICRO 4

███████ CPT CODES ████████

   88305
   88342

████████ DIAGNOSIS ████████

STOMACH, BIOPSY:
     FUNDIC MUCOSA WITH MODERATE TO SEVERE CHRONIC ACTIVE GASTRITIS
     LYMPHOID FOLLICLE FORMATION
     H.PYLORI IMMUNOSTAIN IS POSITIVE FOR ORGANISMS
     NO EVIDENCE OF INTESTINAL METAPLASIA, DYSPLASIA OR MALIGNANCY
     CLINICAL FOLLOW UP RECOMMENDED

This case has been reviewed and interpreted by:

Department of Pathology
St. Elizabeth's Hospital
211 S. Third Street
Belleville, IL  62220
(618) 234-2120 Ext. 1203

████████ GROSS DESCRIPTION ████████

Received in formalin labeled with the patient's name and "random gastric biopsy" are three
pieces of soft, dark tan, light gray tissue measuring 0.5 up to 0.7 cm, filtered and
entirely submitted in one cassette.

These tests were developed and the performance characteristics determined by St. Joseph's
Hospital, Belleville, Illinois, and/or Clarient Diagnostic Services.  They have not been
cleared or approved by the US Food and Drug Administration (FDA).  The FDA has determined
that such clearance or approval is not necessary.  These tests are used for clinical

M.D. REVIEW
DATE            1/19/12
DOCTOR
PULL CHART
SEE PAGE 3)
FILE                Dr

AC/PE/HIV

Touchette Regional Hospital
5900 Bond Avenue
Centreville, IL 62207
External Specimen Inquiry

Name: MURPHY, JAMELL, R71055
Acct#: V00060201318 Unit#: M000275301      Age/Sex: 31/M      Attend Dr: THOMAS, DEVLAND A MD
Reg: 01/06/12      Disch:      Status: REG SDC      Location: T OPS
                              DOB: 06/08/80

#### GROSS DESCRIPTION      (Continued)

purposes.  Prognostic and predictive testing should be interpreted in the context of
additional clinical and/or histopathologic findings.

#### MICROSCOPIC DESCRIPTION

Microscopic review supports the diagnosis.

#### SURGICAL QUESTIONNAIRE

          CLINICAL HISTORY: DYSPHAGIA, HEMORRHAGE
    PRE-OPERATIVE DIAGNOSIS: SAME
   POST-OPERATIVE DIAGNOSIS: DISTAL ESOPHAGITIS EROSIVE GASTRIC
       SURGICAL PROCEDURE: EGD AND RANDOM GASTRIC BIOPSIES

Signed _____ (Electronically Signed) _____      EMILY S POPOVIC, MD 01/11/12

Patient: MURPHY, JAMELL, R71055      Age/Sex: 31/M      Acct#V00060201318 Unit#M000275301

M.D. REVIEW  1/19/12
DATE
DOCTOR
PULL CHART
SEE PATIENT          DE/HIV
FILE

OneRadiology
Normal, IL 61761
Date: 01/28/2019

Patient: Murphy, Jamell
ID#: R71059
D.O.B.: 06/08/80
Ordered by: Zimmer, N.P.
Menard Correctional Center

CHEST X-RAY, TWO VIEWS 01/24/19:

INDICATION:  Coughing up blood.

TECHNIQUE:  Two views.  Comparison is made with prior exam dated 12/07/2018.

FINDINGS:  There is no focal consolidation, pleural effusion, or pneumothorax.  The cardiac silhouette
and pulmonary vascularity are within normal limits.  The visualized osseous structures are
unremarkable.

IMPRESSION:
No acute cardiopulmonary pathology.

Signed _____
                X. Austin, M.D.

XA: cah
DIC.: 01/28/2019

Films from Menard Correctional Center

M.D. REVIEW
DATE __1|9|19
DOCTOR _____
PULL CHART
SEE PATIENT _____ CC/PE/HIV
FILE _____

Received
1/31

Offender Information:

Murphy _____ Jamell _____ MI ___ ID#: R71059
Last Name        First Name

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 10:15Am 1-23-19 | **Med Furlough Clerk Note:** | |
| | Patient Scheduled for Cardiothoracic Surgery eval @ Prairie Cardio- Cardiothoracic. | |
| | Auth # 4023902351 | |
| | CMcDonough | |
| | C. McDonough/ Med Furlough Clerk | |
| | | |
| 1/24/19 | NP note | P: Atline 5/u PRN |
| 110 | 3' S/u fer SOB + small | CXR now |
| 12/70 | cut on FA Rt Ilm | |
| 16 | setting things on fire | |
| 70 | in cell house. | |
| 98 70 | 0: small superficial | |
| | laceration noted to Rt. | |
| | outer eye Brow. Cleansed | |
| | Steri-stripp.D. LCTA. | |

Distribution: Offender's Medical Record                Printed on Recycled Paper

A: Laceration
Smoke inhalation

m Zimmer APN
DOC 0051 (Eff. 9/2002)
(Replaces DC 7147)

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

### Menard Correctional Center

Offender Information:

Last Name: Murphy   First Name: Jamell   MI: ___   ID#: L71059

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 1/24/19 1³⁰p | XRay note CXR done | Steckman RTMU |
| 1/24/19 8³⁰pm | RN note Health Status Completed for pending transfer — X Dodderstark RN | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 71-7)

Offender Information:

Murphy _____ Jamall _____ ID#: R71059
Last Name _____ First Name _____ M.I.

| Date/Time Chro Note Subjective, Objective, Assessment | Plans |
|---|---|
| 1/24/19 6:36p out of sequence | (S) I/M stated "I'm good Ms. Lang." (O) Assessment for Seg placement. NAD noted. Denies A-□ contraindications for placement. (A) Seg Placement | (P) May proceed to Seg/NA placement. S/C PRN. _A Lang RN_ |

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

__Menard Correctional__ Center

Offender Information:

Last Name: *Murphy*  First Name: *Jamell*  MI: ___  ID#: *R71059*

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

DOC 0094 (Eff. 9/2002)
Replaces DC 7117

Printed on Recycled Paper

Exhibit 2 

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**OFFENDER'S GRIEVANCE**

 RECEIVED N2 6-26 Bed #: A

MAR 15 2019

| Date: 3-14-19 | Offender: (Please Print) Jamell Murphy | ID#: R71059 |
|---|---|---|
| Present Facility: Menard C.C. | Facility where grievance issue occurred: Menard C.C. | |

226-3-19

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Other (specify): _____
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] ADA Disability Accommodation
- [ ] HIPAA

- [ ] Disciplinary Report: ____/____/____
  Date of Report              Facility where issued

RECEIVED
MAR 18 2019
MENARD CC
CLINICAL SERVICES

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves protective custody, involuntary administration of psychotropic drugs, issues from another facility except medical and personal property issues, or issues not resolved by the Chief Administrative Officer.

**Summary of Grievance** (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): On 3-12-2019 Murphy Began to Suffer An Medical Emergency To He Began to Cough up blood from his lungs he Then notified The 6 Gallery Officer who Then notified The Med tech & Sargent. Murphy was Then Removed from Cell 626 & Taken To one Med tech Baba who noticed The blood clot's That Inmate Murphy Coughed into a closer she Then notified Nurse practioner who Then Directed her to Contact the Medical Director who then Made the decision To send Murphy back out to Carbondale Memoriral Hospital To The Emergency Room due To This Medical Emergency Murphy was seen by Carbondale doctors who

**Relief Requested:** Surgery To Remove lesions/Mass from lung & spleen

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.
- [x] Check if this is NOT an emergency grievance.

| Jamell Murphy | R71059 | 3/14/19 |
|---|---|---|
| Offender's Signature | RECEIVED | Date |

(Continue on reverse side if necessary)

JUN 13 2019
MENARD CC
GRIEVANCE OFFICE

---

**Counselor's Response** (if applicable)

| Date Received: 3/18/19 | [x] Send directly to Grievance Officer | [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |
|---|---|---|

Response: SEE ATTACHED HCU RESPONSE.

| T BRADLEY CCII | T Bradley CCII | 6/11/19 |
|---|---|---|
| Print Counselor's Name | Counselor's Signature | Date of Response |

---

**EMERGENCY REVIEW**

| Date Received: ____/____/____ | Is this determined to be of an emergency nature? | [ ] Yes; expedite emergency grievance [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner. |
|---|---|---|

| | |
|---|---|
| Chief Administrative Officer's Signature | Date ____/____/____ |

11E Surgery To Remove lesions/mass R71059



Ran Test additional C.T. scans blood work & x-Rays To which blood work Came Back Normal but doctor's informed Murphy That Mass in which he believed was just Discovered on his lungs Recently was known about by Carbondale Hospital & Menard's Medical Health Care providers in 2011 when Murphy was first sent out for a C.T. Scan.

Murphy were never Told or Informed about This lesion On his left lung by Menard at the Time Medical director or Any Medical staff & Murphy Continued To experience Coughing up blood & other Medical Issues for the next 8 year's until his Condition his Became monitor'd

due To The Mass of lesion on Murphy's lung which Continues To Cause him Trouble Breathing a pain & severe ache's & blood Coughing Murphy Now seek's To have The lesion On his lungs Removed & The Mass On his Spleen which Causing him Severe Stomach pain's.

This has been an On going Issue which Murphy Continues To suffer with for The last eight years & I Request Surgery To have each lesion Removed Due To The Extreme pain's outlasting their Causing Murphy On The daily Basis.

—End-

Jamell Murphy #671059


ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

| Date: 1-28-19 | Offender: (Please Print) Jamell Murphy | ID#: R71059 |
|---|---|---|

| Present Facility: Menand Corr Ctr. | Facility where grievance issue occurred: Menand Jistasville / ponriac |
|---|---|

18-3-19

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Other (specify):
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] ADA Disability Accommodation
- [ ] HIPAA

- [ ] Disciplinary Report: _____ / _____ / _____
  Date of Report          Facility where issued

RECEIVED
MAR 0 4 2019
THIRD CC
CLINICAL SERVICES

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves protective custody, involuntary administration of psychotropic drugs, issues from another facility except medical and personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): On Feb 24th 2019 Murphy was sent out for a Consult after several Complaints about Coughing up blood from lungs to a Doctor at Carbondale Hospital To determine if 4.5 Cm lesion On his left lung (paratracheal) was Cancerous This Consult Came as a Result from a CT scan to which Murphy Received at St. Joseph Hospital in East St. Louis due To Menard sending Murphy There after Multiple Complaint about Trouble Breathing & Coughing up blood & when an X-ray found a Mass Murphy was Told That his lymph node were swollen & Ther he had and additional lesion On his spleen In addition to his left lung. Murphy had

Relief Requested: Further Testing on Mass On Testicle

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.
- [x] Check if this is NOT an emergency grievance.

| Jamell Murphy | R71059 | 1 / 28 / 19 |
|---|---|---|
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

RECEIVED
JUN 19 2019
MENARD CC

| Counselor's Response (if applicable) | |
|---|---|

Date Received: 3 / 14 / 19

- [x] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277.

Response: See ATTACHED HCU Response.

| T. BRADLEY CCII | T. Brown CCII | 6 / 11 / 19 |
|---|---|---|
| Print Counselor's Name | Counselor's Signature | Date of Response |

| EMERGENCY REVIEW | |
|---|---|

Date Received: _____ / _____ / _____

Is this determined to be of an emergency nature?
- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

Chief Administrative Officer's Signature _____ / _____ / _____
                                          Date

Want testing done for // A mass on testicle) has trouble breathing & coughs up blood

been experiencing These symptoms as far Back as 2009 while originally here at Menard Corr. Ctr. & They got worst as The years went on Murphy Complained about a knot on one of his Testicles while here at Menard & Received a filled Unused Exam & was Told That The knot was nothing. Murphy had also Coughed up blood here at Menard & doctors said it was also Murphy Then was Transferred to pontiac Corr. ctr. where he first started to have Trouble Breathing In 2012 to which he Complained & nothing was done by their Wexford Par. Health Care at pontiac C.C.

2014 Murphy was Then Transferred stateville Corr. ctr. where he began to Cough up blood from Time To Time & have Irregular heart Beat around 2017 & Complained To Medical direct Dr. obaisi who gave him an x-ray & EKG but Ran No significant Test on Murphy to determine Cause.

Murphy Complained about The symptom he was experiencing & over Three different I.D.o.c Correctional Facilities & Wexford Pain Health Care Dept. over That 9 year span & running was Done In Regards To further Testing In 2009 I complained about a small Mass on One of My Testicle.

    Nothing was done until now while housed In Menard Corr. Ctr. In 2019 when Murphy began to Complain about Trouble Breathing & Coughing up blood.

Murphy, Jamell
R 71059
N2 4-38

*Exhibit # 1*



JB Pritzker
Governor

John Baldwin
Acting Director

### The Illinois Department of Corrections

Menard Correctional Center
711 Kaskaskia Street • Menard, IL 62259 • (618) 826-5071 TDD: (800) 526-0844

## M E M O R A N D U M

**DATE:** June 3, 2019

**TO:** Tyler Bradley, Correction Counselor

**FROM:** Angela Crain, RN, HCUA

**SUBJECT:** Offender Murphy, Jamell R71059 Grievance 18-3-19

Dr. Siddiqui and I are in receipt of Offender Murphy, Jamell R71059 Grievance 18-3-19 dated 01/28/2019 regarding medical treatment. Offender grieves he is not receiving treatment for the mass in his lungs that is causing him to cough up blood. On 01/28/19 the offender was seen by an MD to discuss the results of the CT that was taken at St. Elizabeth's hospital on 12/21/18. The offender had surgery to remove the mediastinal mass on 04/30/19. The offender was admitted into the HCU Infirmary for post-operative care until 05/21/19. The offender was seen for his surgical follow-up on 05/21/19. The offender was seen by an MD on 03/21/19 for testicular pain. It is noted the offender's testicles are normal, non-tender, no masses, and no cyst. Offender was reassured. No other requests regarding lung masses and testicular pain have been received from the offender at this time. Offender should utilize nurse sick call protocol if any further issues.

Dr. Siddiqui, Facility Medical Director

Angela Crain, RN, HCUA
Angela Crain, RN, HCUA

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*

*www.illinois.gov/idoc*

Exhibit #2

JB Pritzker
Governor



John Baldwin
Acting Director

### The Illinois Department of Corrections

Menard Correctional Center
711 Kaskaskia Street • Menard, IL  62259 • (618) 826-5071 TDD: (800) 526-0844

# M E M O R A N D U M

**DATE:**   June 3, 2019

**TO:**   Tyler Bradley, Correction Counselor

**FROM:**   Angela Crain, RN, HCUA

**SUBJECT:** Offender Murphy, Jamell R71059 Grievance 220-3-19

---

Dr. Siddiqui and I are in receipt of Offender Murphy, Jamell R71059 Grievance 220-3-19 dated 03/14/2019 regarding medical treatment. Offender grieves he is not receiving treatment for the mass in his lungs that is causing him to cough up blood.  The offender's complaints were addressed in grievance response 18-3-19. No other requests regarding lung masses have been received from the offender at this time.  Offender should utilize nurse sick call protocol if any further issues.

Dr. Siddiqui, Facility Medical Director

Angela Crain, RN, HCUA

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*

**www.illinois.gov/idoc**

*Exhibit #3*

| | | | |
|---|---|---|---|
| **IDOC #** | R71059 | **Counseling Date** | 06/19/19 10:51:55:910 |
| **Offender Name** | MURPHY, JAMELL | **Type** | Collateral |
| **Current Admit Date** | 05/27/2008 | **Method** | Grievance |
| **MSR Date** | 01/12/2059 | **Location** | MEN GRIEVANCE OFFICE |
| **HSE/GAL/CELL** | E -01-22 | **Staff** | NANNEY, CHERYL A., Office Coordinator |

Grievance Office received grievance #18-3-19 (2nd Level Review) regarding wants testing done for mass on testicle/has trouble breathing and coughs up blood, dated 1/28/19.

**Print Date** 6/19/2019

ILLINOIS DEPARTMENT OF CORRECTIONS  RECEIVED
**OFFENDER'S GRIEVANCE**

JUN 13 2019

| Date: 6-12-19 | Offender: (Please Print) Jamell A Murphy | ID#: K71059 |
|---|---|---|
| Present Facility: Menard C.C. | Facility where grievance issue occurred: Menard C.C. 241-6-19 | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [x] Other (specify): No Response to Grievance S# 29-4-19 & 220-3-19
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] ADA Disability Accommodation
- [ ] HIPAA

- [ ] Disciplinary Report: ___/___/___
  Date of Report                    Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to: JUN 13 2019

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.  CL    ...
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves protective custody, involuntary administration of psychotropic drugs, issues from another facility except medical and personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): This Grievances is to address Clinical Services failure to Respond to Inmate Murphys Two grievances filed on 3-14-19 & 3-31-19 grievance# 29-4-19 & grievance# 220 -3-19 addressed Murphy's Request to have Surgery to Remove a lession/ mass from my lung &/Spleen. And grievance# 29-4-19 addressed that after Suffering an Medical emergency (Coughing up blood) & Being sent (ST-11) Carbondale Memorial Hospital Emergency Room Via State Car & Being given an additional CT Scan Doctor's Then explained That he Reviewed My prior CT Scan From 2011 & Compared it to The CT scan from 2019 St. elizabeth

Relief Requested: Request a Response to Both grievance# 220-3-19 And grievance# 29-4-19 From Clinical Services

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.
- [x] Check if this is NOT an emergency grievance.

| Jamell Murphy | K71059 | 6 12 19 |
|---|---|---|
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: 6 13 19   [ ] Send directly to Grievance Officer   [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: Grievances 29-4-19 and 220-3-19 were both answered on 6-11-19. This grievance is moot.

| C. Richmond | C. Richmond | 6 14 19 |
|---|---|---|
| Print Counselor's Name | Counselor's Signature | Date of Response |

---

**EMERGENCY REVIEW**

Date Received: ___/___/___   Is this determined to be of an emergency nature?
- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

| | |
|---|---|
| Chief Administrative Officer's Signature    24 | Date |

Distribution: Master File; Offender                Page 1        NO response        DOC 0046 (1/2016)
                                                    to Grievances

Hospital it was then that I found out that former Medical Director Doctor Wahasi & Wexford Health Care Received the 2011 test & CT scan Result And Knew about inmate Murphy's Medical Condition As Carbondale Hospital gave them the Results in 2011 when Murphy had made it Known to Wexford employeed Medical Staff here at Menard C.C. At the time that I had Began to have Serious Medical problems Coughing up blood to which Murphy was seen by Medical Director Doctor Wahasi & a x-ray was ordered to which a Mass Could be seen On the x-ray And he submitted Me to Colligeal & Wexford approved a CT scan which Carbondale Memorial hospital did And a biopsy of my stomach which occurred at St. Elizabeth Hospital in East St. Louis IL

Medical Director Wahasi & Wexford Health Care Source Inc. Received the Results of the CT scan & Biopsy from 2011 which from what Carbondale Doctor's said showed a 5 cm Mass there & H-pylori However the Medical Director Never Disclosed my Test Results Regarding the Mass Nor was there Any outside follow up

Murphy went On to Suffer for the Next Eight years Not Knowing what was Causing him to Suffer & Cough up blood & which an additional Mass formed On his spleen which has Not Been Treated As of yet

Darell Murphy
R71059

| | | | |
|---|---|---|---|
| **IDOC #** | R71059 | **Counseling Date** | 06/19/19 10:54:45:770 |
| **Offender Name** | MURPHY, JAMELL | **Type** | Collateral |
| **Current Admit Date** | 05/27/2008 | **Method** | Grievance |
| **MSR Date** | 01/12/2059 | **Location** | MEN GRIEVANCE OFFICE |
| **HSE/GAL/CELL** | E -01-22 | **Staff** | NANNEY, CHERYL A., Office Coordinator |

Grievance Office received grievance #220-3-19 (2nd Level Review) regarding surgery to remove lesions/mass from lung/spleen dated 3-14-19.

**Print Date  6/19/2019**

Exhibit #5

J.B. Pritzker
Governor



Rob Jeffreys
Acting Director

## The Illinois Department of Corrections

1301 Concordia Court, P.O. Box 19277 • Springfield, IL 62794-9277 • (217) 558-2200 TDD: (800) 526-0844

Offender: Murphy, Jamell

ID# : R71059                                                                 7/18/19
                                                                              Date

Facility: Menard

This is in response to your grievance received on 7/1/19_____. This office has determined the issue will be addressed without a formal hearing. A review of the Grievance, Grievance Officer/CAO response to the grievance has been conducted. For a grievance that is direct review by the ARB, a review of the Grievance has been conducted.

Your issue regarding: Grievance dated: 1/28/19 & 3/14/19  Grievance Number: 18-3-19 & 220-3-19  Griev Loc: MEN

☐ Transfer denied by the Facility

☐ Dietary _____

☐ Personal Property _____

☐ Mailroom/Publications _____

☐ Assignment (job, cell) _____

☐ Commissary / Trust Fund _____

☐ Conditions (cell conditions, cleaning supplies, etc.) _____

☐ Disciplinary Report: Dated: _____ Incident # _____

☒ Other   Medical treatment/lung mass & testicle lump

Based on a review of all available information, this office has determined your grievance to be:

☐ Affirmed, Warden _____ is advised to provide a written response of corrective action to this office by

☐ Denied, in accordance with DR504F, this is an administrative decision.

☒ Denied, this office finds the issue was appropriately addressed by the facility Administration.

☐ Denied as the facility is following the procedures outlined in DR525.

☐ Denied as procedures were followed in accordance with DR 420 for removal/denial of an offender from/for an assignment.

☐ Denied as this office finds no violation of the offender's due process in accordance with DR504.80 and DR504.30. This office is reasonably satisfied the offender committed the offense cited in the report.

☐ Other:  Offender has been seen and treated for both issues. Further issues need to be addressed by putting in for NSC

FOR THE BOARD: _Patty Sneed_          CONCURRED: _Rob Jeffreys_  7/15/19
                Patty Sneed                         Rob Jeffreys
          Administrative Review Board               Acting Director

CC: Warden, Menard _____ Correctional Center
    Murphy, Jamell _____, ID# R71059

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*

www.illinois.gov/idoc