IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMELL A. MURPHY,               )
                                )
            Plaintiff,          )
                                )
vs.                             )     Case No. 3:19-CV-1051-MAB
                                )
WEXFORD HEALTH CARE SOURCES,    )
INC. and MOHAMMED SIDDIQUI,     )
                                )
            Defendants.         )

MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Jamell Murphy, a prisoner in the Illinois Department of Corrections, filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated at Menard Correctional Center (Doc. 1; Doc. 86).[1] More specifically, Plaintiff alleges that Dr. Mohammed Siddiqui and Wexford Health Sources, Inc. provided constitutionally inadequate medical care for a mass on his left lung and another mass on his spleen (Doc. 86). This matter is currently before the Court on the motion for summary judgment filed by Dr. Siddiqui and Wexford (Doc. 107; *see also* Doc. 108). For the reasons explained below, the motion is granted.

FACTS

Defendant Wexford Health Sources, Inc. ("Wexford") is a private corporation that

---

[1] The Amended Complaint at Doc. 86 is the operative complaint in this matter.

contracts with the IDOC to provide medical services to inmates in IDOC facilities (*see* Doc. 116, pp. 1–2). Mohammed Siddiqui is a physician employed by Wexford (Doc. 108-3, pp. 3–4). He was a Travelling Medical Director from 2015 until 2017 and then the Medical Director at Menard from 2017 to 2021 (*Id.*).

Plaintiff testified that his symptoms, including coughing up blood, trouble breathing on occasion, chest pain, and testicular pain, began in 2009 or 2010 (Doc. 108-1, pp. 5, 6, 13, 14; *see* Doc. 86). On July 24, 2009, Plaintiff had a testicular ultrasound and the radiologist reported normal testes and a "cystic structure" on the *right* side that was probably "an epididymal cyst or spermatocele[2] (Doc. 108-2, p. 1).

In November 2010, Plaintiff complained in part about "increased mucus production," which Dr. Magid Fahim (who is a non-Defendant) thought was due to a "common cold" (Doc. 108-2, p. 2). Dr. Fahim ordered a chest x-ray, and the radiologist reported a "prominence of the left paramediastinal region"[3] that could be a mass or lymphadenopathy[4] (*Id.* at p. 3). The radiologist stated, "CT could be a further benefit."

---

[2] A spermatocele (also called a spermatic or epididymal cyst) is a fluid-filled sac (cyst) that grows in the epididymis—the small, coiled tube located in the scrotum on the upper testicle that collects and transports sperm. They are noncancerous and typically painless, but they could cause pain and discomfort if they grow too large. MAYO CLINIC, *Spermatocele*, https://www.mayoclinic.org/diseases-conditions/spermatocele/symptoms-causes/syc-20377829 (last visited August 3, 2022).

[3] The mediastinum is the area in the middle of the chest that lies between the lungs, and the sternum and spinal column. The area contains vital organs, including the heart, esophagus, and trachea. Mediastinal tumors develop in one of three areas of the mediastinum: the anterior (front, closer to the sternum), the middle, or the posterior (back, closer to the spine). MEDLINEPLUS, *Mediastinal Tumor*, https://medlineplus.gov/ency/article/001086.htm (last visited August 3, 2022).

[4] According to Wexford's corporate representative, Dr. Glen Babich, adenopathy is any disease or inflammation that involves glandular tissue or lymph nodes (Doc. 108-5). The term is usually used to refer to lymphadenopathy, or swollen lymph nodes (*Id.*). Adenopathy and lymphadenopathy are not cancerous or malignant (*Id.*).

(*Id.*). Plaintiff testified that he was not told about the mass in his chest (*see* Doc. 108-1, pp. 5, 6).

Approximately one month after the chest x-ray, in December 2010, Plaintiff saw Dr. Samuel Nwaobasi and complained that he was coughing up blood and chest pain "for five years" (Doc. 108-2, p. 4).[5] Dr. Nwaobasi referred Plaintiff to Dr. Fahim (who was the Medical Director at Menard at the time) "for possible CT scan of chest based on recent [chest] x-ray report" (*Id.*). It does not appear that a CT scan was approved, and instead a follow-up chest x-ray was performed in February 2011 (*Id.* at p. 6). The "prominence" in Plaintiff's chest was seen once again but "there [was] no significant change since the previous study" (*Id.*). The radiologist thought it "likely represent[ed] anatomic variation" but recommended another follow-up x-ray in six months "to assure that there is no underlying lesion" (*Id.*). That same month, Plaintiff also had another testicular ultrasound, and the probable epididymal cyst was still present (*Id.* at p. 5).

Another chest x-ray was taken on September 16, 2011, showing the "prominence" in Plaintiff's chest was still present and appeared "slightly more prominent, which could be related to the decreased inspiratory effort with decreased lung volumes"—in other words Plaintiff took a shallower breath and his lungs were not as full for this x-ray as they were for the last (Doc. 108-2, p. 7).[6] The radiologist recommended a follow-up chest

---

[5] Dr. Nwaobasi was originally named as a Defendant in this case (Doc. 1). However, he was already deceased by the time Plaintiff filed his complaint (Doc. 1; Doc. 7). When Plaintiff failed to identify a proper party to substitute in place of Dr. Nwaobasi, the doctor was dismissed without prejudice as a Defendant in this case (Doc. 59).

[6] Before a chest x-ray is taken, the technician asks the patient to take a deep breath and hold it because that helps the heart and lungs to show up more clearly on the image. MAYO CLINIC, *Chest X-rays*,

CT "to be prudent" and "to exclude a developing process" (*Id.*).

The chest CT was approved and performed approximately three weeks later on October 5, 2011 (Doc. 108-2, p. 8). The radiologist noted a "soft tissue density mass . . . measuring approximately 2.5 x 3.0 x 3.5 cm . . . in the left anterior mediastinum" as well as a small pulmonary nodule in the right lung (*Id.*). The differential diagnosis for the mediastinal mass "includes but is not limited to lymphoma versus less likely metastatic disease," and further evaluation with a PET scan was recommended (*Id.*).[7]  The PET scan was performed at Memorial Hospital of Carbondale on November 15th (*Id.* at pp. 10–13; Doc. 108-4, pp. 12–13). The nodule in the right upper lobe measured less than a centimeter ("subcentimeter"), had an SUV max of 0.5,[8] and was "likely benign" (Doc. 108-4, pp. 12–13). The left mediastinal mass measured 3 x 3 centimeters and had an SUV max of 1.6, meaning it was not suspicious for cancer, and "most likely represents adenopathy," or swollen lymph nodes (*Id.*; Doc. 108-5). "Hyperactive focus distal esophagus with SUV

---

https://www.mayoclinic.org/tests-procedures/chest-x-rays/about/pac-20393494#:~:text=The%20X%2Dray%20technician%20may,more%20clearly%20on%20the%20image   (last visited August 3, 2022).

[7] A positron emission tomography scan ("PET scan") is a type of imaging test that shows how organs and tissues are working in real time and is used to detect a variety of conditions, including cancer, heart disease, and brain disorders. During a PET scan, a special dye containing radioactive tracers is given to the patient and the dye collects in areas of the body with high levels of metabolic or chemical activity. Diseased cells, such as cancer cells, are generally more active and have a higher metabolic rate than normal cells and absorb large amounts of the dye. The patient's body is then scanned and the areas where the dye has collected show up as bright spots on the scan. MAYO CLINIC, *Positron Emission Tomography Scan*, https://www.mayoclinic.org/tests-procedures/pet-scan/about/pac-20385078 (last visited August 3, 2022); CLEVELAND CLINIC, *PET Scan*, https://my.clevelandclinic.org/health/diagnostics/10123-pet-scan (last visited August 3, 2022). *See also* Doc. 108-5.

[8] SUV stands for standardized uptake value and is a measure of the tracer absorption in a particular area. Wexford's corporate representative, Dr. Glen Babich, attested in a declaration that, generally speaking, an SUV uptake of under 4.0 is considered not suspicious for cancer/neoplasm (Doc. 108-5).

max of 4.4," was also noted, which "could be inflammatory or neoplastic,"[9] and "[d]irect visualization" was recommended (Doc. 108-4, pp. 12–13). According to Wexford's corporate representative, Dr. Glen Babich, tissues lining the digestive tract are generally more active and absorb more dye during a PET scan because they are subjected to the rigors of intake and digestion and the body regularly replaces the tissues thus increasing dye consumption (Doc. 108-5). Additionally, inflammation caused by gastritis would further increase dye consumption (*Id.*).

Dr. Nwaobasi's notes on November 21, 2011 indicate that the PET scan was "negative" and an EKG was "normal" except for sinus bradycardia (Doc. 108-2, p. 14).[10] Dr. Nwaobasi also wrote that there was "no evidence of pulmonary or cardiac [cause] for [Plaintiff's] chest pain" (*Id.*). He noted that approval for an upper endoscopy had been requested and received, (*Id.*),[11] in order to "directly visualize" Plaintiff's esophagus, as recommended. The EGD was performed on January 6, 2012 (Doc. 108-2, pp. 16–17). The

---

[9] A neoplasm is an abnormal mass of tissue, also commonly referred to as a tumor. Neoplasms may be benign/non-cancerous or malignant/cancerous. Yale Medicine, *Neoplasm (Tumor)*, https://www.yalemedicine.org/conditions/neoplasm (last visited August 3, 2022).

[10] An electrocardiogram ("EKG") is a test that records the electrical signals in the heart and is used to detect heart problems and monitor the heart's health. Mayo Clinic, *Electrocardiogram*, https://www.mayoclinic.org/tests-procedures/ekg/about/pac-20384983 (last visited August 3, 2022). Bradycardia is a slow heart rate. It can cause dizziness, fatigue, weakness, or shortness of breath. Mayo Clinic, *Bradycardia*, https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474 (last visited August 3, 2022). It is unclear when the EKG was conducted (*see* Doc. 108-2).

[11] An esophagogastroduodenoscopy ("EGD"), which is also referred to as an upper endoscopy, is a procedure used to look at the inner lining of the upper digestive tract, including the esophagus, stomach and duodenum, which is the first part of the small intestine. Cleveland Clinic, *Upper Endoscopy*, https://my.clevelandclinic.org/health/treatments/4957-upper-endoscopy-procedure (last visited August 3, 2022).

radiologist noted the presence of erosive gastritis and distal esophagitis, (*id.*), both of which involve damage/inflammation of sections of the digestive tract but are not cancerous or malignant (Doc. 108-5). Tissue samples taken during the endoscopy were positive for H. pylori (Doc. 108-2, pp. 18–19). It is undisputed that H. pylori "is a common digestive bacterium that can cause conditions similar to those experienced by Plaintiff" (Doc. 116, p. 5).[12] It is also undisputed that no source of bleeding was identified during the upper endoscopy (*see* Doc. 116, p. 7; *see also* Doc. 108-2, p. 18). Plaintiff testified that Dr. Nwaobasi told him he had an ulcer and never told him about the mediastinal mass in his chest (Doc. 108-1, p. 5; *see also id.* at pp. 8, 9). Plaintiff was given medication to treat the H. pylori, which he testified helped alleviate some of his complaints, but he continued to cough up blood (Doc. 108-1, pp. 10–11).

Plaintiff had another chest x-ray taken in January 2012 following his complaints that he was coughing up blood (Doc. 108-2, p. 20) and a follow-up chest x-ray in July 2012 (*Id.* at p. 21). Both noted that the mediastinal mass remained largely unchanged (*Id.*). According to Dr. Siddiqui, a noncancerous mass can be left untreated if it is not causing any problems or symptoms (Doc. 108-3, p. 28). Another chest x-ray was taken on January 10, 2013, following Plaintiff's complaints that he was coughing up blood and had abdominal pain (*Id.* at p. 22). The radiologist did not mention the mediastinal mass or

---

[12] Helicobacter pylori (H. pylori) is a bacteria that can infect your stomach and cause peptic ulcers. Signs or symptoms of an H. pylori infection include an ache or burning pain in the abdomen, nausea, loss of appetite, frequent burping, bloating, and unintentional weight loss. MAYO CLINIC, *Helicobacter pylori infection*, https://www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes/syc-20356171 (last visited July 29, 2022).

note any other abnormalities (*Id.*). Two months later, in March 2013, Plaintiff complained that he was out of medicine for his esophagitis and was coughing up blood (Doc. 108-2, p. 24). His medications were renewed for one month (*Id.*). Plaintiff made the same complaints in June 2013 (*Id.* at p. 25). Another chest x-ray and labs were ordered and Plaintiff's prescriptions were renewed for three months (*Id.*). The chest x-ray was taken on June 12th, and the radiologist did not mention the mediastinal mass or note any other abnormalities (Doc. 108-2, p. 23).

The medical records provided to the Court drop off after June 9, 2013, and resume in late March/early April 2017, when Plaintiff complained of a stomachache and reported coughing up blood and a history of ulcers (Doc. 108-2, pp. 26, 27). Labs were ordered and Plaintiff was given a prescription for Prilosec and told to follow-up in one month (*Id.* at p. 27). A similar scenario played out in September 2017 (*Id.* at p. 28).

It is undisputed that Dr. Mohammed Siddiqui became involved in Plaintiff's medical care in the fall of 2018 (*see* Doc. 116, p. 6; *see also* Doc. 108-3, p. 5). Specifically, Plaintiff underwent another chest x-ray on October 23, 2018, apparently at the direction of Dr. Siddiqui (*see* Doc. 116, p. 6), following his complaint of shortness of breath and chest pressure (Doc. 108-2, p. 29). The report noted an "extra density" in Plaintiff's chest that measured up to five centimeters (*Id.*). A CT scan was recommended to further investigate whether it was a mass or enlarged lymph node (*Id.*).

The first record of Dr. Siddiqui actually seeing Plaintiff is from December 4, 2018, approximately one and a half months after the chest x-ray (Doc. 108-2, p. 30). At that visit, Plaintiff complained about chest pain, his heart skipping beats, and occasional shortness

of breath (*Id.*). Dr. Siddiqui noted that a previous EKG showed no evidence of PVCs but did show "significant bradycardia" (*Id.*). [13] He further noted Plaintiff had a left mediastinal mass, was currently on psychiatric medications, and had no history of hypertension or angina (*Id.*). Dr. Siddiqui noted he had already received approval from Wexford for a chest CT scan and a referral to a cardiologist (*Id*; Doc. 108-3, pp. 5–6, 7).

The CT scan was performed on December 21, 2018 (Doc. 108-2, p. 32). The mediastinal mass, measuring 4.5 x 2.9 x 1.7 centimeters, was seen, and other adjacent smaller masses, likely adenopathy, were noted (*Id.*). The radiologist stated the etiology of the mediastinal mass was uncertain, but malignant neoplasm was possible and a biopsy should be considered (*Id.*). He also noted the previously-identified nodule in Plaintiff's right upper lobe, which he characterized as a "calcified granuloma" (*Id.*). Finally, a two-centimeter nodule on Plaintiff's spleen was observed for the first time, which the radiologist stated was "possible metastasis" (*Id.*). Following the CT scan, Dr. Siddiqui sought and received approval for a biopsy but it does not appear the biopsy was ever done (*see id.* at pp. 32, 33, 40; Doc. 108-3, p. 8).

Plaintiff saw cardiologist Dr. Shahabuddin Mohammad on January 18, 2019 (Doc. 108-2, pp. 34–38). Dr. Mohammad concluded that Plaintiff had sinus bradycardia (which is a slow heart rate), "most likely due to the athletic nature of the patient" (*Id.*). He further

---

[13] Premature ventricular contractions (PVCs) are extra heartbeats that disrupt the regular heart rhythm, sometimes causing a sensation of a fluttering or a skipped beat in the chest. Occasional PVCs usually are not a concern and likely do not need treatment if they are not frequent or bothersome and the patient does not have an underlying heart condition. MAYO CLINIC, *Premature Ventricular Contractions*, https://www.mayoclinic.org/diseases-conditions/premature-ventricular-contractions/symptoms-causes/syc-20376757#:~:text=Overview,skipped%20beat%20in%20the%20chest (last visited August 3, 2022).

noted that Plaintiff's chest pain was "most likely musculoskeletal," and the chest pain and shortness of breath were not likely due to a cardiac issue (*Id.*). He stated that Plaintiff did not require "any further workup" but did recommend further evaluation by a Holter monitor for 48 hours and perhaps a beta-blocker, depending on the results (*Id.*).[14]  Finally, he wrote that the mediastinal mass and hemoptysis (coughing up blood) would be managed by Plaintiff's primary care physician (*Id.*).

Dr. Siddiqui followed the cardiologist's recommendation to evaluate Plaintiff with a Holter monitor, and based on the results, Plaintiff was started on a beta-blocker (Doc. 108-2, p. 41). Dr. Siddiqui also sought and received approval from Wexford for a consultation with a cardiothoracic surgeon (*see* Doc. 108-2, pp. 39, 40; *see also* Doc. 108-3, pp. 8–9). Before that consultation could take place, however, Plaintiff underwent a (seemingly unplanned) chest x-ray and a CT angiogram at Memorial Hospital in Carbondale on March 12, 2019 (*Id.* at pp. 42–44).[15]  The report indicates that the left mediastinal mass measured approximately 41 x 24 x 43.5 millimeters, which was "slightly *decreased* in size in comparison to the previous exams in 2011" (*Id.*) (emphasis added). There was no definite evidence of pulmonary embolus or significant pulmonary nodules or opacities (*Id.*). Plaintiff's heart appeared normal, as did his upper abdomen, body wall

---

[14] A Holter monitor is a small, wearable device that records the heart's rhythm and is used to detect or determine the risk of irregular heartbeats. MAYO CLINIC, *Holter Monitor*, https://www.mayoclinic.org/tests-procedures/holter-monitor/about/pac-20385039#:~:text=A%20Holter%20monitor%20is%20a,details%20about%20the%20heart's%20condition (last visited August 3, 2022).

[15] Neither party mentioned how these tests came to pass (*see* Docs. 108, 115, 116, 117). It appears, however, the tests were done in the emergency room after Dr. Siddiqui sent Plaintiff to the hospital because he was coughing up blood (*see* Doc. 108-2, pp. 42–44, 46; *see also* Doc. 108-1, p. 12).

soft tissues, and bones (*Id.*). The report also states that Plaintiff still needs a biopsy because they were unsuccessful in their attempt (*Id.*).

On March 18, 2019, Plaintiff saw Dr. Russell McElveen, a cardiothoracic surgeon at Carbondale Memorial Hospital, regarding the mediastinal mass (Doc. 108-2, pp. 46–48; *see also id.* at pp. 49–50). Dr. McElveen noted "I discussed risk of removing the mass. I did tell him that I do not think it is cancer, but we will have to get tissue to make a final diagnosis. My goal is to remove the mass but would not [put] any vital structures at risk given that the mass has not grown much over an 8-year time span." (*Id.* at p. 48).

Three days later, Dr. Siddiqui saw Plaintiff again, where Plaintiff complained about testicular pain for more than five years (Doc. 108-2, p. 45). Dr. Siddiqui performed a testicular examination and found Plaintiff's testicles to be normal, non-tender, and without masses or cysts (*Id.*). He provided reassurance to Plaintiff (*Id.*).

Dr. McElveen, the cardiothoracic surgeon, reported that Plaintiff wanted to have the mediastinal mass removed "for concerns of cancer" and the surgery took place on April 30, 2019 (Doc. 108-2, pp. 49–50). The mass was noted to be mobile and not affixed to any structures. Dr. McElveen spent about two and a half hours removing portions of the mass and noted "the mass was adherent to the phrenic nerve and careful dissection was used to dissect the mass off of the phrenic nerve" (*Id.*). He was not able to remove the entire mass due to its location (Doc. 108-1, p. 13; *see also* Doc. 108-2, p. 64). According to Dr. Siddiqui and Dr. Babich, there is no way of knowing if sooner surgical removal of the mediastinal mass could or would have affected the mass's proximity to the phrenic nerve (Doc. 108-3, p. 12; Doc. 108-5). Pathology results revealed that the mass was

"negative for any metastatic or cancerous lesion" (Doc. 108-2, pp. 51–53). The final diagnosis was benign angiomyoma (*Id.*).

In May 2019 and August 2019, Dr. Siddiqui noted that Plaintiff still needed a CT scan to follow-up on the splenic nodule (Doc. 108-2, pp. 54, 57). It took place on October 1, 2019 (Doc. 108-2, p. 59). The splenic lesion was "stable from the prior exam" in December 2018 (*Id.*). The "etiology remain[ed] indeterminate" but it could be a "cystic lesion" or "hemangioma or hamartoma" and "malignant etiologies . . . [were] considered relatively less likely due to the stability over nearly 10 months" (*Id.*).

Dr. Siddiqui saw Plaintiff again on October 8, 2019, where Plaintiff complained of pain in his left testicle but refused a testicular exam (Doc. 108-2, p. 60). Plaintiff also complained of chest pain and blood in his urine (*Id.*). Dr. Siddiqui ordered a urinalysis, discussed the possibility of epididymitis and potential treatment, and discussed the results of the recent CT scan (*Id.*). He noted that Plaintiff wanted "more opinions/surgery" (*Id.*). A testicular ultrasound conducted on November 26, 2019, showed a "small *left* epididymal cyst" (*Id.* at p. 61). There was no mention of the previously identified right cyst (*see id.*).

Dr. Siddiqui saw Plaintiff again on June 22, 2020, where Plaintiff complained that he was coughing up blood (Doc. 108-2, pp. 62, 67). Dr. Siddiqui requested and received approval from Wexford for a CT scan (*Id.*). A chest CT and abdominal CT were performed on October 5, 2020 (*Id.* at pp. 63–64). A two-centimeter mass on the spleen was noted, "which may represent hemangioma," and an ultrasound was recommended to correlate that finding (*Id.*). A hemangioma is a noncancerous/nonmalignant growth of blood

vessels and other tissues (Doc. 108-5). The radiologist further also noted that the mediastinal mass was still present but had decreased in size (because some of it was surgically removed) and now measured about two-and-a-half centimeters (Doc. 108-2, pp. 63–64). The recommended ultrasound of Plaintiff's spleen was performed on December 18, 2020 (*Id.* at p. 69). The radiologist noted a "2.8 centimeter hyperechoic splenic lesion . . . this is statistically most likely to represent hemangioma" (*Id.*).

There are no additional medical records and Dr. Siddiqui left his employment with Wexford in July 2021 (Doc. 108-3, p. 4; *see* Doc. 108-2, Doc. 108, Doc. 115, Doc. 116, Doc. 117).

Wexford's corporate representative, Dr. Glen Babich, was asked to testify as to whether, between 2010 and 2011,[16] Wexford had any policies or procedures, written or unwritten, regarding when imaging studies are needed for a patient; ordering imaging studies in general or in response to coughing up blood, chest pain, fainting or passing out; generating medical records or reports following an imaging study; informing patients of the results of an imaging study (Doc. 108-6; *see also* Doc. 108-7). He was also asked whether Wexford had any policies or procedures detailing medical treatment or procedures for when a mass/lesion is revealed on a patient's lung or for an ulcer (Doc. 108-6; *see also* Doc. 108-7). Dr. Babic testified that Wexford did not have any such policies or procedures between 2010 and 2011; rather, these were all matters left to the discretion

---

[16] The parties agreed to limit the time period to 2010 and 2011 (Doc. 108, p. 9; Doc. 116, p. 10).

of the individual healthcare provider based on his or her knowledge, skill, education and training (Doc. 108-6).

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party always bears the initial responsibility of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The manner in which this showing can be made depends upon which party will bear the burden of proof on the challenged claim(s) at trial. *Celotex,* 477 U.S. at 331 (Brennan, J., dissenting). In cases such as this one, where the burden of proof at trial rests on the plaintiff, the defendant can make its initial showing on summary judgment in one of two ways. *Id.; see Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016); *Modrowski*, 712 F.3d at 1168. First, the defendant can show that there is an absence of evidence—meaning a complete failure of proof—supporting an essential element of the plaintiff's claim. *Celotex,* 477 U.S. at 331; *Hummel*, 817 F.3d at 1016. Second, the defendant can present affirmative evidence that negates an essential element of the plaintiff's claim. *Celotex,* 477 U.S. at 331; *Hummel*, 817 F.3d at 1016.

If the movant fails to carry its initial responsibility, the motion should be denied. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). On the other hand, if the movant does carry its initial responsibility, the burden shifts to the non-moving party to "inform the trial judge of the reasons, legal or factual, why summary judgment

should not be entered." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 455 (7th Cir. 2018) (citation omitted). The non-moving party cannot rely on allegations in the pleadings but rather must come forward with evidentiary materials that set forth "specific facts showing that there is a *genuine issue for trial*" on all essential elements of his case. *Celotex*, 477 U.S. at 324; *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see also* FED. R. CIV. P. 56(c)(1). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In deciding a motion for summary judgment, the court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

## DISCUSSION

The Eighth Amendment's proscription against cruel and unusual punishment creates an obligation for prison officials to provide inmates with adequate medical care. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). Evaluating whether the Eighth Amendment has been violated involves a two-prong analysis. The court first looks at whether the plaintiff suffered from an objectively serious medical condition and, second, whether the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *E.g., Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In applying this test, the court

"look[s] at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728–29 (7th Cir. 2016).

Defendants argue that Plaintiff cannot prove either prong of the deliberate indifference analysis (Doc. 108). The Court finds, however, that it need not address the first prong—whether Plaintiff was suffering from a serious medical condition—because even if it is assumed that he did, he has not put forth sufficient evidence from which a jury could conclude that Dr. Siddiqui or Wexford exhibited deliberate indifference.

A prison official exhibits deliberate indifference when they know of a serious risk to the prisoner's health but they consciously disregard that risk. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). The deliberate indifference standard "requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073. It is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted).

### A. Dr. Mohammed Siddiqui

Plaintiff's claim against Dr. Siddiqui is that the doctor failed to provide timely and adequate medical treatment for the mass on his lung and the mass on his spleen, which caused him to cough up blood and suffer unnecessary pain in his stomach, chest, and

testicles (Doc. 86; *see also* Doc. 108-1, p. 12).

In the context of medical professionals, the deliberate indifference standard has been described as the "professional judgment standard." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008). Treatment decisions are "presumptively valid" and entitled to deference so long as they are based on professional judgment—meaning they are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments—and do not go against accepted professional standards. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citation omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). A medical professional may be held to have displayed deliberate indifference if the treatment decision was "blatantly inappropriate" even to a layperson, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties*, 836 F.3d at 729 (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious."), or there is evidence that the treatment decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties*, 836 F.3d at 729; *see also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'").

Defendants argue there is no evidence from which a jury could conclude that Dr. Siddiqui acted with deliberate indifference to Plaintiff's medical conditions (Doc. 116, pp. 13–15) and Plaintiff made no argument to the contrary (*see* Doc. 116). After reviewing the

evidence, the Court agrees with Defendants.

It is undisputed that Dr. Siddiqui did not become involved in Plaintiff's care until late October 2018 (Doc. 116, p. 6). Dr. Siddiqui started with a chest x-ray, which led to a chest CT scan, a consultation with a cardiologist, another chest x-ray and a CT angiogram, a consultation with a cardiothoracic surgeon, and culminated in surgery to remove the mediastinal mass on April 30, 2019—approximately six months after Dr. Siddiqui became involved in Plaintiff's care. Pathology confirmed the mass was not cancerous, which is what various doctors had long-suspected. With respect to the mass on Plaintiff's spleen, it has been monitored since it was discovered on December 21, 2018 in the midst of Dr. Siddiqui's efforts to evaluate the mediastinal mass. Plaintiff has had two additional CT scans and a splenic ultrasound. The mass has been reported as stable and is most likely a benign growth.

Despite the care he received, Plaintiff apparently thinks that Dr. Siddiqui did not do enough for him or act quickly enough (*see* Doc. 108-1, p. 12). However, the evidence shows that Dr. Siddiqui took continuous steps to investigate the cause of Plaintiff's symptoms and to evaluate the mediastinal mass in his chest and the mass on his spleen and provide treatment when necessary and appropriate. Dr. Siddiqui did everything that was recommended by the radiologists and specialists. There is no diagnostic exam or treatment that was refused. And there is no expert testimony that Plaintiff necessitated more urgent care or that the timeline of care provided by Dr. Siddiqui was unreasonably long given Plaintiff's condition, and neither is self-evident from the medical records.

For these reasons, no reasonable jury could find that Dr. Siddiqui acted with

deliberate indifference, and he is entitled to summary judgment.

### B. Wexford Health Sources, Inc.

A private corporation acting under the color of state law, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). The corporation cannot be held liable simply because it employed the alleged wrongdoer, *Est. of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017); rather, "a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir. 2010)). This requires a plaintiff to demonstrate that "the 'moving force' behind his constitutional injury" was an express policy adopted and promulgated by the corporation, an informal but widespread and well-settled practice or custom, or a decision by an official of the corporation with final policymaking authority. *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *City of Canton v. Harris,* 489 U.S. 378, 379 (1989)); *Glisson*, 849 F.3d at 379. An unconstitutional corporate policy can also "take the form of . . . a gap in expressed policies." *Dixon*, 819 F.3d at 348 (quoting *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2009)).

Here, Plaintiff claim is rooted in Wexford's lack of policies and procedures in 2010 and 2011 about imaging studies, generally speaking, as well as treating tumors and ulcers (Doc. 115, p. 6; *see also* Doc. 86).[17]  These matters were instead left to the discretion

---

[17]  The parties agreed to limit the time period to 2010 and 2011 (Doc. 108, p. 9; Doc. 116, p. 10).

of individual healthcare providers based on their knowledge, skill, education and training (Doc. 115, p. 6). Plaintiff argues that "the absence of any policies or procedures led to systematic deficiencies," which is the reason he "did not receive treatment needed for his objectively serious medical needs" (*Id.*).

Wexford's deliberate choice not to enact general policies to guide the medical staff's decision-making is not in and of itself a constitutional violation. *See Glisson*, 849 F.3d at 380, 382 ("[W]e are not holding that the Constitution or any other source of federal law required Corizon to adopt the Directives or any other particular document."). Rather, Plaintiff has to show that Wexford had actual knowledge that these general policies were necessary to ensure prisoners received adequate medical care and that constitutional violations would occur in the absence of the polices, yet Wexford nevertheless did nothing to enact such policies. *See Glisson*, 849 F.3d at 382. *See also King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable."). In other words, Plaintiff has to show that Wexford "fail[ed] to have procedures in place for addressing a known risk of serious harm." *Lapre v. City of Chicago*, 911 F.3d 424, 430 (7th Cir. 2018).

Plaintiff has not put forth evidence necessary to make the requisite showings. First, Plaintiff has not even demonstrated that he suffered a constitutional injury. The Court already determined that Dr. Siddiqui was not deliberately indifferent, and Plaintiff made

no argument that Dr. Fahim, Dr. Nwaobasi, or any other clinicians who saw him acted with deliberate indifference (nor is it readily apparent) (*see* Doc. 115). Consequently, there is no constitutional injury that could possibly be attributed to Wexford's lack of policies or protocols. Wexford is therefore entitled to summary judgment.

But even if there was an underlying constitutional violation by one of the individual clinicians, Plaintiff has not put forth evidence sufficient for a reasonable jury to conclude that Wexford knew its physicians would violate prisoners' constitutional rights in the absence of the policies at issue. For example, Plaintiff made no argument and presented no evidence of a prior pattern of similar constitutional violations where medical staff mishandled prisoners who were coughing up blood or fainting, who reported chest pain, or who had tumors (*see* Doc. 115). *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380 (7th Cir. 2020), *cert. denied* 141 S. Ct. 1125 (2021). Absent evidence of a pattern of problems caused by a lack of protocols, Plaintiff could still present a viable *Monell* claim if he showed his situation was the type that prison medical providers were almost certain to encounter and involved "a risk of constitutional violations . . . so high and [a] need for training so obvious" that the failure to act could "reflect deliberate indifference and allow an inference of institutional culpability." *J.K.J.*, 960 F.3d at 380–82 (holding that jury could find the risk of male prison guards sexually assaulting female inmates was so blatantly obvious that the county's failure to provide a meaningful policy or training on preventing and detecting such assaults could be characterized as deliberate indifference). [18] But

---

[18] *See also City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (providing the example that police officers will be required to arrest fleeing felons, and they are given firearms in part to accomplish that task,

Plaintiff made no argument and provided no evidence that his situation fell into this "narrow range of circumstances." *J.K.J.*, 960 F.3d at 380.

Consequently, no reasonable jury could conclude that Wexford's lack of policies or procedures caused Plaintiff any constitutional harm, and Wexford is entitled to summary judgment.

### CONCLUSION

The motion for summary judgment filed by Defendants Mohammed Siddiqui and Wexford Health Sources, Inc. (Doc. 107) is **GRANTED.** Judgment is granted in their favor and this case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: August 18, 2022**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

---

which makes "the need to train officers in the constitutional limitations on the use of deadly force . . . 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."); *Glisson*, 849 F.3d at 382 (holding a jury could find that prison knew for certain its medical providers would be confronted with patients with chronic illnesses and the need to establish protocols for the coordinated care of chronic illnesses was so obvious that the provider's failure to do so could be seen as deliberate indifference).